**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SUMMER INFANT (USA), INC., ) | |
| ) | C.A. No. 17-cv-549 |
| Plaintiff/Counter-Defendant, ) | |
| v. ) | District Judge John J. McConnell, Jr. |
| ) | |
| TOMY INTERNATIONAL, INC., ) | Magistrate Judge Patricia A. Sullivan |
| ) | |
| Defendant/Counterclaimant. ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR CLAIM CONSTRUCTION ORDER
BY DEFENDANT/COUNTERCLAIMANT TOMY INTERNATIONAL, INC.**

This is a patent case involving a single patent, U.S. Patent No. 6,578,209 ("'209 Patent) (Ex. 1), entitled "Tubs for Bathing Infants and Toddlers." The '209 Patent is owned by Defendant/Counterclaimant, TOMY International, Inc. ("TOMY"). It is alleged that Plaintiff/Counter-defendant Summer Infant (USA), Inc. ("Summer Infant") is liable for willful patent infringement based on its manufacturing and sale of an infant and toddler tub called the Comfy Clean Deluxe, which was designed to displace TOMY's patented tub at Wal-Mart.

At issue is the meaning of certain terms and phrases from the asserted claims of the '209 Patent. For the reasons discussed, TOMY's claim constructions should be adopted by this Court.

**I.    The Parties' Exchanges**

Pursuant to the Scheduling Order in this case, the parties exchanged their contentions regarding claim terms. TOMY identified six claim terms or phrases it wished to have construed, and provided its proposed constructions for each. Ex. 2. Summer Infant identified no claim terms for construction, and stated only that it believed that the claims should be construed according to "dictionary definitions." Ex. 3. Summer Infant did not identify any particular dictionary definitions for any identified claim term or phrase. Accordingly, the positions of the parties are summarized in the table below.

| *Claim term/phrase at issue* | *TOMY's Proposed Construction* | *Summer Infant's Proposed Construction* |
|---|---|---|
| "Molded plastic body" | One-piece plastic body formed from a mold | "Dictionary definition" |
| "Seating surface(s)" | a surface that supports the posterior or buttocks of the user when seated | "Dictionary definition" |
| "Distal edges joined at a bottom surface apex" | Distal edge: an area of a seating surface situated furthest away from its respective back rest.<br>Joined: connected either directly or indirectly by an intervening structure.<br>Bottom surface apex: a high point of the bottom surface of the body between the seating surfaces.<br>Construction of overall limitation: areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces | "Dictionary definition" |
| "Nesting space differential less than about two inches (five centimeters)" | the difference in height between n tubs and n+1 tubs is less than approximately two inches (five centimeters). | "Dictionary definition" |
| "Stacking factor less than about 20%": | the stacking factor is the result of the calculation of $(H_{two\ tubs} - H_{single\ tub})/ H_{single\ tub})*100$, which must be less than approximately 20% (where H = height). | "Dictionary definition" |
| "Wale" | a ridge-like structure | "Dictionary definition" |

## II.    The '209 Patent

The patent-in-suit, the '209 Patent, issued on June 17, 2003, and was filed as U.S. Patent application serial no. 09/975,924 on October 12, 2001. The '209 Patent is entitled "Tubs for Bathing Infants and Toddlers," and its Abstract generally describes the invention as:

> A tub for bathing children is configured with opposing back rests and associated seating surfaces, for bathing an infant reclining against one of the back rests, or a toddler seated against the other back rest. The tub is molded of a shape enabling multiple tubs to nest particularly well, for efficient merchandising and storage …. Ex. 1, p. 1.

The '209 Patent has 31 claims. Claims 1, 22, 23, and 30 are independent claims, and the remainder are dependent claims.[1] Independent claims 1, 23, and 30, as well as dependent claims

---

[1] An independent claim stands on its own. A dependent claim incorporates the subject matter of the claim from which it depends, and include further limitations. 35 U.S.C § 112, ¶ 4.

2-8, 12, 15, 18, 21, 24-29 and 31 have been identified by TOMY as being infringed by Summer Infant. Independent claims 1, 23 and 30 are reproduced below.

> 1. A tub for bathing children, the tub comprising a <u>molded plastic body</u> having an upper rim and defining a bathing basin sized for bathing a young child and having a bottom surface and opposing side walls forming opposite ends of the basin,
> a first of the opposing side walls extending at a first incline angle with respect to the rim, and a second, opposite one of the opposing side walls extending at a second incline angle with respect to the rim, the first and second inclined side walls forming first and second back rests for children seated in the tub in different orientations;
> the bottom surface having two <u>seating surfaces</u> disposed at differing inclinations and extending from respective back rests to <u>distal edges joined at a bottom surface apex</u> spaced from either end of the basin, each seating surface forming, together with a respective one of the back rests, an inclined seat;
> wherein the body has a nominal thickness and upper and lower surfaces having matching shape across an overall extent of the tub so as to enable the tub to nest within an identical tub with a <u>nesting space differential of less than about two inches (five centimeters)</u>.
>
> 23. A tub for bathing children, the tub comprising a <u>molded plastic body</u> having an upper rim and defining a bathing basin sized for bathing a young child and having a bottom surface and opposing side walls forming opposite ends of the basin, wherein the body has a nominal thickness and upper and lower surfaces having matching shape across an overall extent of the tub so as to enable the tub to nest within an identical tub with a <u>stacking factor of less than about 20 percent</u>;
> a first of the opposing side walls extending at a first incline angle with respect to the rim, and a second, opposite one of the opposing side walls extending at a second incline angle with respect to the rim, the first and second inclined side walls forming first and second back rests for children seated in the tub in different orientations;
> the bottom surface having two <u>seating surfaces</u> disposed at differing inclinations and extending from respective back rests to <u>distal edges joined at a bottom surface apex</u> spaced from either end of the basin, each seating surface forming, together with a respective one of the back rests, an inclined seat;
> wherein the cavity includes two side troughs extending along either side of the inclined seats and formed within <u>wales</u> defining resting points positioned to support the tub on a horizontal surface, the wales forming laterally aligned sink divider notches at one end of the cavity, and laterally aligned ledges at the other end of the cavity, the notches sized and positioned to receive an upper edge of a divider of a double sink when the tub is placed over one basin of the double sink with the ledges resting on one outer edge of the sink.
>
> 30. A tub for bathing children, the tub comprising a <u>molded plastic body</u> having an upper rim and defining a bathing basin sized for bathing a young child and having a bottom surface and opposing side walls forming opposite ends of the basin, wherein the

> body has a nominal thickness and upper and lower surfaces having matching shape across an overall extent of the tub so as to enable the tub to nest within an identical tub with a <u>nesting space differential of less than about two inches (five centimeters)</u>;
>
> a first of the opposing side walls extending at a first incline angle with respect to the rim, and a second, opposite one of the opposing side walls extending at a second incline angle with respect to the rim, the first and second inclined side walls forming first and second back rests for children seated in the tub in different orientations;
>
> the bottom surface having two <u>seating surfaces</u> disposed at differing inclinations and extending from respective back rests to <u>distal edges joined at a bottom surface apex</u> spaced from either end of the basin, each seating surface forming, together with a respective one of the back rests, an inclined seat;
>
> wherein the cavity includes two side troughs extending along either side of the inclined seats and formed within <u>wales</u> defining resting points positioned to support the tub on a horizontal surface, the wales forming laterally aligned sink divider notches at one end of the cavity, and laterally aligned ledges at the other end of the cavity, the notches sized and positioned to receive an upper edge of a divider of a double sink when the tub is placed over one basin of the double sink with the ledges resting on one outer edge of the sink.

For sake of reference, the claim terms/phrases at issue are underlined.

Claims 1-21 were allowed in their original form. Ex. 4, TI_000790-792; TI_000883. In other words, these claims were allowed by the U.S. Patent and Trademark Office ("PTO") as originally filed, and no amendments and no arguments were made to these claims to obtain allowance. Issued claim 23 was originally filed as claim 22. Ex. 4, TI_000793. Original claim 22 was amended to reflect original filed claim 29 in independent form. Ex. 4, TI_000794; TI_000942.  As such, issued claim 23 is original filed dependent claim 29 rewritten in independent form. Independent claim 30 was added during prosecution of the '209 Patent, and was also allowed without need for amendment or arguments for patentability. Ex. 4, TI_000942-943. The patent examiner, in the Notice of Allowability, allowed each of the asserted claims without further comment.  Ex. 4, TI_000949.

## II. Relevant Law On Claim Construction

The claims of a patent are the numbered paragraphs towards the end of the patent. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the

patentee is entitled the right to exclude." Phillips, 415 F.3d at 1312. As such, the first step in any patent infringement action is to construe any claim terms or phrases identified by the parties as requiring construction. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). Claim construction is an issue of law for the court, and which is subject to *de novo* review. Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S.Ct. 831, 841 (2015).

The claim construction inquiry must be centered on the intrinsic evidence, namely, the claims, specification and prosecution history, because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996); Markman v. Westview Instr., Inc., 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claims must also be interpreted from the perspective of one of ordinary skill in the relevant art at the time of the invention. Phillips, 415 F.3d at 1313.

Claim construction starts with the claims, id. at 1312, and remains centered on the words of the claims throughout. Interactive Gift Express, Inc. v. CompuServe, Inc., 256 F.3d 1323, 1331 (Fed.Cir.2001). A patentee is normally entitled to the full scope of its claim language, Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1358 (Fed. Cir. 2004), and a departure from this general rule may be warranted only where the patentee either clearly sets forth a different definition of a claim term in the specification or disavows the full scope of the claim term during prosecution. See Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362, 1365-66 (Fed.Cir. 2012).

Claims must also be read in view of the specification. The specification of a patent includes the written description preceding the claims. The specification is often "the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315. A patentee may also act as

its own lexicographer by clearly setting forth a definition of a claim term or phrase in the intrinsic evidence. CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1250 (Fed.Cir.1998). Indeed, the Federal Circuit regularly states "that a construction which excludes the preferred embodiment is 'rarely, if ever correct.'" PPC Broadband, Inc. v. Corning Optical Commn. RF, 815 F.3d 747, 755 (Fed. Cir.2016), quoting, Vitronics, 90 F.3d at 1583. Indeed, "a claim construction that excludes the preferred embodiment is highly disfavored." Duncan Parking Tech., Inc. v. IPS Group, 914 F.3d 1347, 1364 (Fed.Cir.2019).

A court must also consider the prosecution history, if it is in evidence, which includes the communications between the patentee and the PTO. Phillips, 415 F.3d at 1317 ("The prosecution history, which we have designated as part of the 'intrinsic evidence,' consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."). To the extent that a patentee made any express statements regarding the scope of the claims, such statements may also be a source for the correct claim interpretation. Id.

Lastly, a court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. Id. at 1317-19 (internal quotation marks and citations omitted). Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. Id. Extrinsic evidence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the

context of the intrinsic evidence." Id. at 1318-19. Indeed, "[l]egal error arises when a court relies on extrinsic evidence that contradicts the intrinsic record." Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC, 824 F.3d 999, 1003 (Fed. Cir. 2016).

### III. Claim Constructions

TOMY, in its letter to Summer Infant that identified the claim terms for construction, requested Summer Infant to advise TOMY with which, if any, proposed claim terms/phrases it agreed. Ex. 2. Summer Infant did not respond. As is demonstrated below, TOMY's proposed claim construction are correct as a matter of law.

#### A. "Molded plastic body"

Each of the asserted claim terms includes the limitation that the tub comprises "a molded plastic body." TOMY proposes that this phrase be defined to mean a "one-piece plastic body formed from a mold."

The claim recites a "molded plastic body." Thus, the tub body is made of plastic, which is formed from a mold. This is fully supported by the patent specification. For example, the specification states "[t]he body may be molded of various resins, including polypropylene." Ex. 1, col. 3:3-4. The specification further states "[t]he polypropylene body of the tub 10 is molded as one-piece with a nominal wall thickness …." Id., col. 6:2-4. It is also well understood that a piece formed from plastic injection molding is a monolithic piece, i.e., one-piece. Ex. 5. In addition, the recitation of a "body" further suggests a single piece object. Id.

The prosecution history includes no further explanation for the claim term "molded plastic body." As such, it is not relevant to the inquiry.

While a dictionary is not intrinsic evidence, the ordinary meanings for "mold" and "body" are fully consistent with TOMY's proposed construction. See Ex. 6. The American Heritage®

Dictionary of the English Language, Fifth Edition copyright ©2019 by Houghton Mifflin Harcourt Publishing Company (mold: "a hollow form or matrix for shaping a fluid or plastic substance"; molded: "To form (something) out of a fluid or plastic material"; body: "A mass of matter that is distinct from other masses").

Accordingly, TOMY respectfully submits that this Court should construe "a <u>molded plastic body</u>" as a "one-piece plastic body formed from a mold."

### B. Seating Surface(s)

The claims of the '209 Patent recite a bottom surface of the tub, and that the bottom surface has "two <u>seating surfaces</u> disposed at differing inclinations and extending from respective back rests to distal edges joined at a bottom surface apex spaced from either end of the basin, each seating surface forming, together with a respective one of the back rests, an inclined seat…." See e.g., Ex. 1, claim 1. TOMY contends that the proper construction for "seating surface" is "a surface that supports the posterior or buttocks of the user when seated." As before, Summer Infant offers no definition, but instead simply says "dictionary definition."

"Surface" is not debated, but what surface is a "seating" surface is. The claim states that a seating surface in combination with a back rest forms an inclined seat. This "seating surface" is described in the specification. In the Summary of the Invention, the '209 Patent states:

> Preferably, the first inclined wall extends generally at an angle of between about 35 and 45 degrees with respect to horizontal with the tub resting upright on a horizontal surface. In a particularly preferred embodiment, the first inclined wall extends generally at an angle of about 41 degrees with respect to horizontal with the tub resting upright on a horizontal surface, with the seating surface associated with the first inclined wall inclined at about 45 degrees with respect to horizontal with the tub resting upright on a horizontal surface. Preferably, the second inclined wall extends generally at an angle of between about 70 and 85 degrees with respect to horizontal with the tub resting upright on a horizontal surface. In the presently preferred embodiment, the second inclined wall extends generally at an angle of about 77 degrees with respect to horizontal with the tub resting upright on a horizontal surface, with the seating surface associated with the first inclined wall disposed generally horizontally with the tub resting upright on a horizontal

> surface. The seating surfaces may be joined by a central bottom surface portion that rises from the distal edge of one of the seating surfaces to the distal edge of the other of the seating surfaces.

Ex. 1, col. 2:54-68. The Detailed Description, which describes a preferred embodiment, further explains with reference to Figure 13 (colors added to figure for sake of reference):

> The general side profile of the seating surfaces can be seen in the cross-section of FIG. 13. As shown, two seating surfaces are disposed at one end of the tub (the left end, as shown), an inclined surface 62 extends generally at the angle É1 of about 41 degrees and serves as a back rest for a reclining infant (see also FIG. 1). At the lower end of surface 62, a tub bottom surface 64 extends upward generally at an angle é1 of about 45 degrees and forms a seating surface associated with back rest 62, with apex 66 received behind the knees of the infant. At the other end of the tub (the right end, as shown), an opposing back rest 68 extends generally at the angle É2 of about 77.5 degrees and serve as a back rest for a toddle seated on generally horizontal seating surface 70 (see also FIG. 2).



FIG. 13

Ex. 1, col. 5:41-55.

Thus, in the preferred embodiment, the toddler seat includes a back rest (orange) and a seating surface (red), and the infant seat includes a back rest (blue) and a seating surface (green). These seating surfaces "may be joined by a central bottom surface portion that rises from the distal edge of one of the seating surfaces to the distal edge of the other of the seating surfaces." Ex. 1, col. 2:64-67. This central bottom surface portion is colored yellow.

When the child is seated in a more upright position, e.g., the toddler seat, her buttocks are supported by the red seating surface. When the child is seated in a substantially reclined position,

e.g., the infant seat, her buttocks rest on the green seating surface so she does not slide down. Thus, as is plainly described in the '209 Patent, the "seating surface(s)" are the portion of the bottom surface that supports the posterior or buttocks of the user when seated.

The prosecution history includes no further explanation for the claim term "seating surfaces." As such, it is not relevant to claim construction issues.

TOMY's suggested definition for "seating surface" is fully consistent with the ordinary meaning of "seat." For example, "seat" is shown in general purpose dictionaries to mean "the part on which one rests in sitting." Ex. 6.

Accordingly, TOMY respectfully submits that this Court construe "seating surface" as "a surface that supports the posterior or buttocks of the user when seated."

C.   **"Distal edges joined at a bottom surface apex"**

Each of the asserted claims recites the limitation "distal edges joined at a bottom surface apex." In context, the claim recites:

> the bottom surface having two seating surfaces disposed at differing inclinations and extending from respective back rests to <u>distal edges</u> <u>joined</u> at a <u>bottom surface apex</u> spaced from either end of the basin, each seating surface forming, together with a respective one of the back rests, an inclined seat

see e.g., Ex. 1, claim 1. As before, Summer Infant states that "dictionary definitions" should control, but gives no actual claim construction. TOMY contends that the phrase "distal edges joined at a bottom surface apex" means "areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces."

Because the subject phrase is made up of several terms: "distal edge" "joined" and "bottom surface apex," the construction for each of term is discussed separately. For the reasons discussed, TOMY's proposed construction should be adopted.

### 1. "Distal Edges"

TOMY contends that the proper construction of "distal edges" as used in the '209 Patent is an area of a seating surface situated furthest away from its respective back rest. Distal is most often used in describing anatomy, and means "located far from a point of reference." Ex. 6. An "edge" commonly means a line or an area farthest away from the middle. Ex. 6. In the context of the patent, it refers to an area furthest from the seat back for the particular seat.

This meaning is fully aligned with the teachings of the specification. As discussed above with respect to the "seating surfaces," the claim specifies that a seating surface extends away from its respective back rest, and that the ends of the seating surfaces are then connected. In the preferred embodiment, they are connected by a connecting bottom surface portion at a bottom surface apex. This is discussed in further detail below.

### 2. "Joined"

The word "joined" is apparently disputed by the parties. TOMY's claim construction for "joined" as "connected either directly or indirectly by an intervening structure" is the interpretation that is fully consistent with the ordinary meaning of the word, the claim language, and the teachings of the specification. By contrast, Summer Infant appears to contend that the word "joined" requires the distal edges of the seating surfaces physically end and are then physically attached to one another by a joint. Summer Infant's construction is contrary to the express teachings of the '209 Patent, would improperly read out the preferred embodiment of the invention, and ignores the claim language; and therefore, is wrong.

The patent claims specify that the distal edges of the seating surfaces are "joined at a bottom surface apex." For example, claim 1 recites: "the bottom surface having two seating surfaces disposed at differing inclinations and extending from respective back rests to distal

edges joined at a bottom surface apex." Nothing in this claim language requires that the distal edges are directly connected, i.e., that they touch each other. Instead, the claim language is broad enough to cover either a direct connection, or an indirect connection, such as where a structure connects the two distal edges. Absent some clear reason to the contrary, TOMY is entitled to the full scope of its claim language. See Home Diagnostics, 381 F.3d at 1358. Moreover, nothing in the claim requires that the seating surfaces are separate pieces joined by a "joint." Indeed, there is no teaching of such a structure anywhere in the '209 Patent. Accordingly, it cannot be correct.

The doctrine of claim differentiation further supports TOMY's claim construction. As mentioned, an independent claim stands on its own, while a dependent claim incorporates the subject matter of the claim from which it depends, and includes further limitations. 35 U.S.C § 112, ¶ 4. Claim 18 depends from claim 1, and therefore, as a matter of law, claim 1 is broader than claim 18. AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1242 (Fed. Cir. 2003). Claim 18 adds the limitation to claim 1: "wherein the seating surfaces are joined by a central bottom surfaced portion that rises from the distal edge of one of the seating surfaces to the distal edge of the other of the seating surfaces." Claim 18 plainly addresses a particular embodiment where the distal edge of one seating surface does not touch the distal edge of a second seating surface because they are joined by an intervening structure. By contrast, claim 1 does not require direct or indirect connection, but rather only that the seating surfaces are "joined." As such, claim 1 must be broad enough to cover both direct and indirect connections. See Advanced Steel Recovery, LLC v. X-Body Equipment, 808 F.3d 1313, 1317 (Fed.Cir. 2015), citing Phillips, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

The specification further demonstrates TOMY's claim construction to be correct. The Summary of the Invention teaches that "[t]he seating surfaces may be joined by a central bottom surface portion that rises from the distal edge of one of the seating surfaces to the distal edge of the other of the seating surfaces." Ex. 1, col. 2:64-67. Thus, to be aligned with the teachings of the patent, a claim construction must include connecting the distal edges directly, or indirectly with an intervening structure. Indeed, a claim construction requiring direct connection of the distal edges or the presence of a "joint" would be wrong because it would exclude the preferred embodiment of the invention where the distal edges are connected via a "central bottom surface portion," and the tub is a "one-piece" body. Vitronics, 90 F.3d at 1583.

The patent drawings also make clear that the invention contemplates distal edges that are connected by an intervening structure. As shown in Fig. 13 of the '209 Patent, which is provided above, one seating surface (red), connects with the other seating surface (green) at a bottom surface apex (pink), via the intervening central bottom surface portion (yellow). The patent drawings also show a monolithic body, and no terminal ends to the seating surfaces. Thus, TOMY's definition of "joined" should be adopted by this Court.

### 3. "Bottom Surface Apex"

The last part of the phrase "distal edges joined at a bottom surface apex" is "bottom surface apex." The plain meaning of the claim language is clear. An apex is simply a high point. The claim language also expressly states that the bottom surface apex is between the two seating surfaces. The high point is evident from the patent specification and drawings. As such, the correct meaning of "bottom surface apex" is a high point of the bottom surface of the body between the seating surfaces.

### 4. Summary: "Distal edges joined at a bottom surface apex"

To summarize, the proper interpretation of the claim limitation: "distal edges joined at a bottom surface apex" should be: "areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces." Any requirement in the claims that a seating surface must physically terminate, i.e., that in order for the "distal edges" to be "joined" they must be separate pieces that are then connected together, must be rejected. Such a construction would not align at all with the teachings of the patent specification because it would exclude the preferred embodiment of the tub body, which the '209 Patent specification expressly describes as a one-piece structure. As a molded product, a single piece construction is the only interpretation that makes sense in the context of the pertinent technology.

### D. "Nesting space differential less than about two inches (five centimeters)"

The next phrase, "nesting space differential less than about two inches (five centimeters)," is found in all the asserted claims except claim 23. "Nesting space differential" is not a common term, but instead, is expressly defined in the '209 Patent.

A patentee is entitled to be its own lexicographer if it clearly defines a particular term in the patent specification. CCS Fitness, 288 F.3d at 1366. The '209 Patent states: "[b]y nesting space differential, we mean the maximum linear difference in space occupied by one tub and two tubs nested together. Generally, this will be the increase in vertical stack height by adding one more tub to a stack of already nested tubs." Ex. 1, col. 1:57-62. Put another way, "nesting space differential" is defined as the difference in height between "n" tubs and "n+1" tubs.

The next part of the phrase is that the nesting space differential is "less than about two inches (five centimeters)." The word that is in question is "about." TOMY contends that "about"

simply means "approximately." Summer Infant has, as before, offered no construction.

Qualifying words, such as "about", are commonly used in patent claims. The Federal Circuit has opined numerous times on words of approximation, such as "about."

> "This court has looked at the meaning of the term "about," and similar qualifying words or phrases … and has developed an approach to the interpretation of such terms: '[T]he word 'about' does not have a universal meaning in patent claims, ... the meaning depends upon the technological facts of the particular case. … The use of the word 'about,' avoids a strict numerical boundary to the specified parameter. Its range must be interpreted in its technological and stylistic context. We thus consider how the term ... was used in the patent specification, the prosecution history, and other claims. It is appropriate to consider the effects of varying that parameter, for the inventor's intended meaning is relevant. Extrinsic evidence of meaning and usage in the art may be helpful in determining the criticality of the parameter...."

Ortho-McNeil Pharm., v. Caraco Pharm., Lab., 476 F.3d 1321, 1326-27 (Fed.Cir. 2007), quoting, Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1217 (Fed.Cir.1995) (citations omitted). See also Modine Mfg. Co. v. U.S. ITC, 75 F.3d 1545, 1554 (Fed.Cir.1996) ("the usage [of the term 'about'] can usually be understood in light of the technology embodied by the invention").

TOMY's expert on plastic molding manufacturing confirms there are well accepted manufacturing tolerances in the industry, which are typically on the order of hundredths of inches. Ex. 5. The claim language itself gives guidance as to what is meant by "about." The claim states that the nesting space differential is less than about 2 inches or 5 centimeters. 2 inches is not exactly 5 centimeters: 2 in = 5.08 cm, and 5 cm = 1.9685 in.

Nonetheless, the case law is clear – where a word of approximation is used, it is incorrect to assign a specific numerical limitation. Therefore, TOMY's proposed construction of "nesting space differential less than about two inches (five centimeters)" as "the difference in height between n tubs and n+1 tubs is less than approximately two inches (five centimeters)" should be adopted by this court.

### E.     "Stacking Factor Less Than 20%"

Like "nesting space differential", the claim phrase "stacking factor less than 20%" is not a common term. Instead, it is expressly defined in the '209 Patent:

> By "stacking factor" we mean the increase in height of two such tubs nested together, as compared to a single such tub. For example, if each tub has a height of 10 inches (25 centimeters), and the tubs nested together have a stacked height of 12 inches (30 centimeters), then we would say that such tubs have a stacking factor of 20 percent.

Ex. 1, col. 2:5-11. Following the given example, the stacking factor is the difference in height between two tubs and one tub, divided by the height of the single tub, which is then multiplied by 100 to obtain a percentage, or $(H_{two\ tubs} - H_{single\ tub})/H_{single\ tub} * 100$.

This calculated number must be less than "about 20%." As with "nesting space differential", the parties' disagreement relates to the meaning of "about." TOMY contends, for the same reasons as previously discussed, that "about" simply means approximately. Summer Infant, as before, declined to give any definition.

For the reasons discussed above, "about" is properly construed as "approximately." Accordingly, the '209 Patent expressly defines "stacking factor" as being calculated by $(H_{two\ tubs} - H_{single\ tub})/H_{single\ tub} * 100$, and this number must be less than approximately 20%.

### F.     "Wales"

The claim term "wales" is found in all of the asserted claims except claim 1. As described in the '209 Patent, wales are a "ridge-like structure." The particular features of the wales are also specified in the patent claims.

> The tub of claim 1 wherein the cavity includes two side troughs extending along either side of the inclined seats and formed within <u>wales defining resting points positioned to support the tub on a horizontal surface</u>. Ex. 1, claim 2.

> The tub of claim 2 wherein the <u>wales form laterally aligned sink divider notches at one end of the cavity, and laterally aligned ledges at the other end of the cavity</u>, the notches sized and positioned to receive an upper edge of a divider of a double sink when the tub

> is placed over one basin of the double sink with the ledges resting on one outer edge of the sink. Ex. 1, claim 3.
>
> The tub of claim 2 wherein <u>the wales each have longitudinal ends disposed behind the back rests and positioned to abut opposite walls of a single sink with the tub rim resting upon an upper edge of the sink and the tub disposed within the sink</u>. Ex. 1, claim 5.

The "wales" are further described in the specification and drawings.

> Referring to FIGS. 4 and 5, the bottom of the tub includes two longitudinal, parallel **wales 26** that define tub resting points in a plane corresponding to a flat horizontal surface upon which the tub may be set for use. These resting points include **wale end portions 28 at one end of each wale, and projections 30 at the other end of each wale**. For proper nesting with identical tubs, the inner surface of each wale 26 forms a trough 32 on the inside of the tub, running along either side of the seating surfaces, that receives a wale of a nested tub. A notch 16 is defined adjacent the projection 30 of each wale, for receiving a double sink divider as shown in FIG. 3A. Ex. 1, col. 4:49-60.



As shown, the claimed "wales" are the red colored portions.

Thus, as is clearly taught by the '209 Patent specification and shown in the drawings, the wales are ridge-like structures that define resting points. In certain dependent claims, the wales further define certain features, such as sink divider notches and ledges for a double sink.

## IV.     Conclusion

For the foregoing reasons, TOMY's claim constructions, as set forth below, should be adopted by this Court.

| | |
|---|---|
| "Molded plastic body" | one-piece plastic body formed from a mold |
| "Seating surface(s)" | a surface that supports the posterior or buttocks of the user when seated |
| "Distal edges joined at a bottom surface apex" | areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces |
| "Nesting space differential less than about two inches (five centimeters)" | the difference in height between n tubs and n+1 tubs is less than approximately two inches (five centimeters). |
| "Stacking factor less than about 20%": | the stacking factor is the result of the calculation of ($H_{two\ tubs}$ − $H_{single\ tub}$)/ $H_{single\ tub}$)*100, which must be less than approximately 20% (where H = height). |
| "Wale" | a ridge-like structure |

Dated: May 22, 2019

Respectfully submitted,

s/ Joseph M. Kuo
Joseph M. Kuo (admitted pro hac vice)
Illinois Bar No. 6216400
Saul Ewing Arnstein & Lehr, LLP
161 N. Clark Street, Suite 4200
Chicago, IL 60601
312-876-7151
Joseph.kuo@saul.com

Zachary W. Berk (R.I. Bar No. 7453)
Saul Ewing Arnstein & Lehr, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
Zachary.berk@saul.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2019, a true copy of this document was send via the court's electronic filing system to all counsel of record. In addition, a copy of this document was served on the following via electronic mail:

        Jeffrey K. Techentin (jtechentin@apslaw.com)
        Jaime Bachant (jbachant@apslaw.com)
        ADLER POLLOCK & SHEEHAN P.C.
        One Citizens Plaza, 8th Floor
        Providence, RI 02903

        s/ Joseph M. Kuo