**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

SUMMER INFANT (USA), INC.,

     *Plaintiff,*

     -against-               C.A. No. 17-cv-549-JJM-PAS

TOMY INTERNATIONAL, INC.,

     *Defendant.*

**PLAINTIFF SUMMER INFANT (USA), INC.'S
RESPONSE TO DEFENDANT TOMY INTERNATIONAL, INC.'S
<u>MOTION FOR CLAIM CONSTRUCTION ORDER</u>**

Defendant/Counterclaim Plaintiff TOMY International, Inc. ("TOMY") requests in its

Motion for Claim Construction Order (Doc. 34) that this Court construe seven terms.  For the

reasons stated below, Plaintiff/Counterclaim Defendant Summer Infant (USA), Inc. ("Summer

Infant") opposes TOMY's constructions and requests that the Court construe the disputed terms

as follows in accordance with the ordinary meaning of each term and the pertinent intrinsic

evidence, as explained herein.

I.     <u>**BACKGROUND**</u>

     A.     **The Patent-in-Suit**

The patent-in-suit, U.S. Patent No. 6,578,209 ("the '209 patent") was issued on June 17,

2003 and is titled "Tubs for Bathing Infants and Toddlers."  *See* TOMY Br., Ex. 1.  The tub

describes, generally, a tub that is configured to bathe infants in a reclined position and, as the

child grows and develops the ability to sit up, to bathe children in a seated position.  The '209

patent concedes that this basic design was not novel, explaining in the Background section that

"[a]t least one tub has been configured with a reclined back rest at one end for bathing infants, and a more upright back rest at the other end for bathing an older child in a seated position." TOMY Br., Ex. 1 at col. 1, ll. 22-25.   Accordingly, the '209 patent purports only to improve on those prior designs with respect to the "utility and efficiency of such tubs."  *Id*.

Independent claims 1, 23, and 30, as well as dependent claims 2-8, 12, 15, 18, 21, 24-29, and 31 have been asserted by TOMY as infringed by Summer Infant.  The allegedly infringing independent claims are reproduced in TOMY's claim construction brief.  See TOMY Br. at 3-4.

### B.      Governing claim construction standards

The essence of patent protection is a bargain made between the patent applicant and the government.  In exchange for full disclosures of their inventions, applicants are given a limited monopoly to practice those inventions.  Critical to this exchange is the requirement that applicants clearly set forth the scope of their inventions, providing the public the opportunity to avoid using someone else's invention.  In other words, the purpose of a patent is to describe "the exact scope of an invention and its manufacture to secure to [the patentee] all to which he is entitled, [and] to appraise the public of what is still open to them."  *Markman v. Westview, Inc.*, 517 U.S. 370, 373 (1996) (citation omitted).

A determination of infringement "necessitates a determination of what the words in the claim[s] mean," so that courts may find whether or not a patent's claims cover the alleged infringer's product.  *Id*. at 374.  Because one of the "bedrock principle[s]" of patent law is that the claims of a patent "define the invention to which the patentee is entitled the right to exclude," the goal of claim construction is to give proper meaning and scope to claim language "by giving claim terms their ordinary and customary meanings, according to the customary understanding of an artisan of ordinary skill at the time of the invention" after reading the whole patent.  *Phillips*

*v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc.*

*v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

Disputed claim terms are to be interpreted in light of intrinsic and extrinsic evidence. Intrinsic evidence is made up by the claims themselves, the patent specification, and the prosecution history. *See id*. at 1314-17. The claims "must be read in view of the specification, of which they are a part;" however, while "the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples in the specification will not be generally read into the claims." *Constant v. Advanced Micro-Devices*, Inc., 848 F.2d 1560, 1571 (Fed. Cir. 1988). The prosecution history also plays a role in claim interpretation, and "[l]ike the specification, the prosecution history provides evidence of how the [United States Patent and Trademark Office] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). When a patentee distinguishes a claimed invention over the prior art, he is "indicating what the claims do not cover" and "by implication surrendering such protection." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).

Finally, in the event two alternative interpretations of particular claim language are equally plausible, the court should choose the narrower interpretation in order to avoid unfair surprise to the public. *See, e.g.*, *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) (in light of patentee's drafting burden imposed by 35 U.S.C. § 112, which "guard[s] against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights," selecting the broader interpretation would

"undermine the fair notice function of the requirement that the patentee distinctly claim the subject matter disclosed in the patent from which he can exclude others temporarily") (quoting *Gen. Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938)).

## II.   DISPUTED TERMS

| Claim term/phrase at issue | TOMY's Proposed Construction | Summer Infant's Proposed Construction |
|---|---|---|
| "Molded plastic body" | "one-piece plastic body formed from a mold" | Ordinary meaning: "a plastic body formed from one or more molds" |
| "Seating surface(s)" | "a surface that supports the posterior or buttocks of the user when seated" | Ordinary meaning: "a surface that, in combination with a back rest, forms a seat" |
| "Distal edges joined at a bottom surface apex" | Distal edge: "an area of a seating surface situated furthest away from its respective back rest"<br><br>Joined: "connected either directly or indirectly by an intervening structure"<br><br>Bottom surface apex: "a high point of the bottom surface of the body between the seating surfaces"<br><br>Construction of overall limitation: "areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces" | Ordinary meaning: "lines or points situated away from a back rest, connected at the high point of the bottom surface" |
| "Nesting space differential less than about two inches (five centimeters)" | "the difference in height between n tubs and n+1 tubs is less than approximately two inches (five centimeters) | "the difference in height between n tubs and n+1 tubs is less than about two inches (five centimeters)" |
| "Stacking factor less than about 20%" | "the stacking factor is the result of the calculation of ($H_{twotubs}-H_{single}$ | "the stacking factor is the result of the calculation of |

| | $_{tub})/H_{single\ tub})$ *100, which must be less than approximately 20% (where H = height)" | $(H_{twotubs}–H_{single\ tub})/H_{single\ tub})$ *100, which must be less than about 20% (where H = height)" |
|---|---|---|
| "Wale" | "a ridge-like structure" | Ordinary meaning: "a horizontal constructional member used for bracing vertical members" |

### A.    Molded plastic body

| Claim term/phrase at issue | TOMY's proposed construction | Summer Infant's proposed construction |
|---|---|---|
| "Molded plastic body" | "one-piece plastic body formed from a mold" | Ordinary meaning: "a plastic body formed from one or more molds" |

Each of the asserted claim terms describes a tub "comprising a molded plastic body." TOMY proposes that the phrase "molded plastic body" be construed to mean "one-piece plastic body formed from a mold."  This proposed definition would redefine the scope of the claim language and is improper as a matter of law.

Although the claim language refers to a molded plastic body, TOMY attempts to limit this to a *one-piece* body, formed from *a single mold*.  TOMY points to no language in either the claim or the specification that would justify narrowing the construction of this claim to either a one-piece body or to a body formed from a single mold.  Although the patent specification describes a preferred embodiment of the tub in which the "body of the tub 10 is molded as one-piece," it does not say that the one-piece body is formed from one single mold, nor does TOMY's expert so opine.  *See* TOMY Br. at 7, Ex. 5.  Additionally, although one preferred embodiment of the tub is that it is formed from one piece, the Federal Circuit has held that "particular embodiments and examples in the specification will not be generally read into the claims."  *Constant v. Advanced Micro-Devices*, Inc., 848 F.2d 1560, 1571 (Fed. Cir. 1988).

Indeed, the Federal Circuit has cautioned against limiting the claims "even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that 'the patentee … intends for the claims and the embodiments to be strictly coextensive.'"  *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1323).

TOMY points to the dictionary definition for both "mold" and "to form," in support of its constructions.  However, neither definition mandates that the body of the tub described in the '209 Patent be formed from only one mold or be only a single piece.  In other words, TOMY attempts to add an extraneous limitation to the claim, which is an improper and an illegitimate way to narrow the claim.  *See, e.g.*, *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249-50 (Fed. Cir. 1998) ("Nor may we, in the broader situation, add a narrowing modifier before an otherwise general term that stands unmodified in a claim."); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.") (quoting *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)); *see also Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims.") (citing *Lemelson v. United States*, 752 F.2d 1538, 1551–52 (Fed. Cir. 1985)).  Accordingly, Summer Infant objects to a construction of the term "molded plastic body" to one that limits the plastic body to being one piece and formed from a single mold.  Rather, Summer Infant asks that the Court construe the term "molded plastic body" as "a plastic body formed from one or more molds," in accordance with the ordinary meaning of the term.

B.      Seating surface(s)

| Claim term/phrase at issue | TOMY's proposed construction | Summer Infant's proposed construction |
|---|---|---|
| "seating surface(s)" | "a surface that supports the posterior or buttocks of the user when seated" | Ordinary meaning: "a surface that, in combination with a back rest, forms a seat" |

The asserted claims describe, *inter alia*, a tub having a bottom surface, which bottom surface has "two seating surfaces disposed at differing inclinations and extending from respective back rests to distal edges joined at a bottom surface apex spaced from either end of the basin, each seating surface forming, together with a respective one of the back rests, an inclined seat."  TOMY asks this Court to construe "seating surface(s)" as "a surface that supports the posterior or buttocks of the user when seated."  TOMY Br. at 8.  TOMY claims that this interpretation is correct based on language in the specification, which describes the following figure in the '209 patent:



TOMY's brief provides a colored version, presumably colored only for the sake of claim construction:



*FIG. 13*

TOMY Br. at 9.[1]  TOMY argues that the specification describes two seating surfaces, which

correspond to the portion colored red and the portion colored green.  TOMY further argues that a

toddler sitting in the tub has his or her buttocks supported by the red portion, while an infant

sitting in the tub has his or her buttocks supported by the green portion.  On this basis, TOMY

seeks to construe "seating surface" as limited only to the portion where a child or infant's

buttocks or posterior is directly supported, which it identifies as the red and green portions *only*.

---

[1]     Notably, Figure 13 (and other figures from the patent) shows the seats of the tub as divided up into segments by vertical lines, which TOMY colors in its claim construction brief. There is no explanation in the patent as to the nature of these segments, *i.e.*, whether they indicate physical components of the tub or some other, unspecified, feature.  There is no explicit reference to them, and they do not correspond to the reference numerals in the patent specification.  Their significance is, therefore, a mystery.

     Whatever their nature, TOMY's coloring of the segments is arbitrary and without support, calculated to create the illusion of precision where, in fact, there is none.  On the left-hand infant side of the tub, TOMY claims that three particular segments make up the back rest 62—coloring all of these segments blue—and claims that only one segment makes up the purported seating surface 64—coloring this segment green.  TOMY does not explain why the back rest 62 makes up three segments while the seating surface 64 makes up only one, nor why the segment directly to the left of 62—which is unlabeled—is part of the back rest and not the seating surface.  TOMY's coloring of the bottom segment as blue and not green appears to be entirely arbitrary.  Similarly, on the right-hand toddler side of the tub, TOMY colors the unlabeled segment to the left of the red segment 70 as yellow, and claims that this makes up the "central bottom surface portion" described in the patent.  However, this yellow segment is unlabeled.  TOMY does not explain why the "central bottom surface portion" is the yellow portion rather than, for example, segment 66.

In addition to being contrary to common usage of the term "seating surface," this definition was explicitly disclaimed by TOMY during patent prosecution.

A patent's prosecution history plays an important role in the patent system by promoting "the public notice function of the intrinsic evidence and protect[ing] the public's reliance on definitive statements made in prosecution. *Omega Eng'g, Inc.*, 334 F.3d at 1323, 1326. "Competitors are entitled to rely on those representations when determining a course of lawful conduct, such as launching a new product or designing-around a patented invention." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Moreover, "[b]eyond the notice function and reliance-based aspects of a patent's prosecution history, it 'provides evidence of how the [PTO] and the inventor understood the patent.'" *Id.* (citing *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327 (Fed. Cir. 2009)). During claim construction, a patent's prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Phillips*, 415 F.3d at 1317. Accordingly, when the patentee disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered. *Biogen Idec, Inc.*, 713 F.3d at 1095.

During the prosecution of the asserted patent, *via* letter sent on May 30, 2002, the patent examiner rejected then-Claim 22 (which appears as Claim 23 in the patent) for failing to provide antecedent basis in the specification for the "disposed at differing inclinations" limitation set forth in Claim 22. TOMY Br., Ex. 4 at 111-12. In its response to the patent examiner, TOMY noted that the "disposed at differing inclinations" limitation was also present in Claim 1, and further stated:

> "With respect to the two seating surfaces 'disposed at differing inclinations,'. . . the Examiner is directed to the paragraph

> beginning at page 7, line 15, and to Figure 13.  In this embodiment, surface 64 forms one seating surface, . . . and **the other seating surface is formed by surface 70 _and_ the extension of surface 70 that meets surface 64 at apex 66**.

*Id*. at 150 (emphasis added).

In other words, referring again to the colored version of Figure 13 (and assuming that the colored segments correspond to the numbered surfaces (*see* n. 1, *supra*)), during patent prosecution TOMY explicitly stated that the "seating surface" of the tub was (1) "surface 64" (which is colored green) on one side, and (2) "surface 70" (colored red) "and the extension of surface 70 that meets surface 64 at apex 66" (which is colored yellow) on the other side.



Notwithstanding those representations during patent prosecution, TOMY now attempts to limit "seating surface" to only the green area 64, and the red area 70.  But TOY is precluded from so narrowing the limitation, when during patent prosecution, it explicitly defined "seating surface" as the green, red, *and yellow* areas of Figure 13.  *See, e.g.*, *Omega Eng'g*, 334 F.3d at 1323; *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1581, 34 U.S.P.Q. 2d 1673, 1681 (Fed. Cir. 1995) (the patentee, having distinguished a prior art reference in arguments made to the USPTO, "cannot now escape [the defendant's] reliance upon this unambiguous surrender of subject matter").

Accordingly, Summer Infant asks the Court to construe "seating surface(s)" as "a surface that, in combination with a back rest, forms a seat."  This construction is supported by the language of the patent's specification, which describes that the "bottom surface" of the tub has "each seating surface forming, together with a respective one of the back rests, an inclined seat." TOMY Br., Ex. 1 at col. 1, ll. 45-50.

### C.   Distal edges joined at a bottom surface apex

| Claim term/phrase at issue | TOMY's proposed construction | Summer Infant's proposed construction |
|---|---|---|
| "distal edges joined at a bottom surface apex" | "areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces" | Ordinary meaning: "lines or points situated away from a back rest, connected at the high point of the bottom surface" |

Each of the asserted claims describes a tub with a bottom surface, which bottom surface has "two seating surfaces disposed at differing inclinations and extending from respective back rests to distal edges joined at a bottom surface apex spaced from either end of the basin, each seating surface forming, together with a respective one of the back rests, an inclined seat." TOMY seeks to define the term "distal edges joined at a bottom surface apex" as "areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces."  TOMY Br. at 10.  For the following reasons, TOMY's definition of each portion of this claim term is improper.

### 1.   Distal Edge

| Claim term/phrase at issue | TOMY's proposed construction | Summer Infant's proposed construction |
|---|---|---|

| "distal edge" | "an area of a seating surface situated furthest away from its respective back rest" | Ordinary meaning: "a line or point situated away from a back rest" |
| --- | --- | --- |

TOMY asks this Court to construe "distal edge" as "an area of a seating surface situated furthest away from its respective back rest." TOMY Br. at 11. TOMY argues that the word edge "commonly means a line or an area farthest away from the middle," citing to no intrinsic or extrinsic evidence that supports its argument that an edge can be either an area or a specific point.[2] Indeed, TOMY cites to nowhere in the patent specification, claim language, or prosecution history that would support defining an "edge" as an entire area. Instead, TOMY baldly asserts that "[i]n the context of the patent, it refers to an area furthest from the seat back for the particular seat." *Id*.

TOMY's proffered definition of "distal edge" provides no limiting principle that would enable anyone to determine what, in fact, might constitute a "distal edge" and would therefore render the patent claims impermissibly vague. If the "edge" is merely an "area" "furthest" from a back rest, how far from the back rest would this "distal" area begin? One inch from the bottom of the back rest? Two inches? One inch from the end of the seating surface? Or, to state it differently, would there be any portion of the seating surface that is not included in the "distal" portion? If so, how much?

This paradox is compounded when the term "distal edge" is applied in context. The relevant claim language refers to the distal edges "joined at a bottom surface apex." Assuming two seating surfaces are joined at a bottom surface apex ***somewhere within the two seating surfaces***, it is essential to determine if that attachment point is located at the distal edge of the

---

[2] Although TOMY cites to Exhibit 6 in support of this definition, no definition of the word "edge" was included in Exhibit 6.

seating surface, in order to determine whether a given product might infringe the patent. TOMY's proffered definition would render it impossible for anyone to determine with any certainty whether their product infringes because they would be unable to determine whether the joinder of two seating surfaces involved the "distal edges" or not.  A definition of "distal edge" that conceivably includes all or practically all of the seating surface would broaden the claim language to the point of effectively editing out the material limitation that the joining of the seating surfaces is at their distal edges.  Claim interpretations that eliminate express limitations of the claims are inappropriate and therefore TOMY's suggested construction should be rejected. *See, e.g.*, *In re Power Integrations, Inc.*, 884 F.3d 1370 at 1376 (Fed. Cir. 2018) (refusing to construe a claim in such a way that would make claim language "superfluous"); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950–51 (Fed. Cir. 2006) (same); *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Summer Infant respectfully submits that "edge" should be understood as "edge," avoiding this conundrum.  Summer Infant proposes defining the term "distal edge" in accordance with the customary understanding of the terms "distal" and "edge."  This is consistent with the construction applied by the only other court that (to Summer Infant's knowledge) has been called upon to interpret that claim term.  *Julius Zorn, Inc. v. Medi Mfg., Inc.*, No. 3:15-cv-02734-GPC-RBB, 2017 WL 960413, at *18 (S.D. Cal. Mar. 13, 2017) (holding that in the absence of "crystal clear" claim history justifying a more specific definition, "the Court adopts the plain and ordinary meaning of 'proximal and distal edges' and construes the term as 'top and bottom edges").

Distal means simply "away from."  Merriam-Webster defines "distal" in the anatomical context as "remote from the point of attachment or origin, from a point conceived of as central, or from the point of view; located away from the center of the body."  *See* Ex. 1 at p. 5-6.  *See also*, *e.g.*, *MedIdea, L.L.C. v. DePuy Orthopaedics, Inc.*, No. 17-cv-11172-LTS, 2018 WL 5830849, at *9 (D. Mass. Nov. 7, 2018) (construing "distal" and "distally" to mean "away from the hip.").  In the context of an "edge" of a physical object, definitions uniformly point to a purely one-dimensional object, not a two-dimensional "area."

As for "edge," Merriam-Webster defines the term as "the line or point where a material object or area begins or ends; border."  *See* Ex. 1 at p. 7-8.  It also defines "edge" as "the terminating border; a line that is the intersection of two plane faces of a solid object."  *Id*.  The Oxford English Dictionary likewise defines "edge" as "[t]he line in which two surfaces of a solid object meet abruptly" or "[t]he line that forms the boundary of a surface."  *See* Ex. 2 at p. 2-3.

Other uses of the word "edge" in the '209 patent are consistent with "edge" referring to a line or border and inconsistent with TOMY's proffered interpretation as an "area."  In one case, in the context of describing Figure 9, the patent refers to the "distal edge of rim 22."  *See* TOMY Br., Ex. 1 at col. 5, ll. 22-24.  Reference number 22 in figure 9 clearly indicates the outermost border of the tub:



Moreover, the fact that there is a "distal edge" of the rim is strongly indicative of the "edge" being the outermost limit of the rim, rather than an area of the rim, because the rim itself forms

14

the outermost "area" of the tub structure.  If the edge of the rim were an area rather than a line, the word edge would lose all meaning in the phrase "distal edge of rim."

In another example, the specification refers to "an inner edge of ledge 18 [that is] spaced from the center of notch 16 a distance D2 of about 14.5 inches (37 centimeters), so as to enable the tub to safely span one basin of many double sinks."  TOMY Br., Ex. 1 at col. 5, ll. 33-36. Here, "edge" clearly refers not to some indefinite area, but to the inner boundary of the "ledge" 18; if it were to refer to an area, the functionality of spanning a 14.5" distance to enable the use of the tub on a sink would be defeated.[3]

Thus, a distal edge is simply a line or point situated away from a reference point.  In the context of the '209 patent claims, that reference point would be "respective back rests," and therefore the Court should construe "distal edges" as "lines or points situated away from a back rest."

### 2.   Joined at a Bottom Surface Apex

| Claim term/phrase at issue | TOMY's proposed construction | Summer Infant's proposed construction |
|---|---|---|
| "joined at a bottom surface apex" | "connected either directly or indirectly by an intervening structure" that is "a high point of the bottom surface of the body between the seating surfaces" | Ordinary meaning: "connected at the high point of the bottom surface" |

---

[3]   Likewise, the patent specification refers to the ledges "resting on one outer edge of the sink."  "Edge" here clearly refers to the topmost edge of the side of the sink, as can be seen in one of the original illustrations of the invention submitted with the original patent application:



It is a basic principle of patent law that the time at which a patentee has the opportunity to define the scope of the patent is during prosecution.  TOMY did so, and wrote the patent's specification and claims in such a way as to cover a very specific invention.  Now, it is clear that TOMY wishes it had written its patent in such a way as to cover a broader scope—a scope that would capture Summer Infant's tub.  But TOMY simply did not do so.  It cannot now use the claim construction phase as an opportunity to improperly expand the scope of its patent.

TOMY improperly suggests that the Court should construe "joined" independently from "bottom surface apex."  However, because the two terms are connected in the patent by a specific preposition—"at"—ignoring that connection would result in potentially erroneous construction.  As explained below, TOMY's particular arguments as to the construction of "joined" and "bottom surface apex" are misguided, but much more importantly, TOMY's proposed constructions would only make sense if the patent claims identified "distal edges joined *by* a bottom surface apex," not "distal edges joined *at* a bottom surface apex."  TOMY sidesteps this issue by asking that the Court disregard the word "at."  The Federal Circuit has cautioned against "construing individual words of a claim without considering the context in which those words appear," which is "simply not reasonable."  *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016) ("While the broadest reasonable interpretation standard is broad, it does not give the Board an unfettered license to interpret the words in a claim without regard for the full claim language and the written description."); *see also In re Smith Int'l, Inc.*, 871 F.3d 1375, 1382 (Fed. Cir. 2017) ("The correct inquiry in giving a claim term its broadest reasonable interpretation in light of the specification is not whether the specification proscribes or precludes some broad reading of the claim term. . . . And it is not simply an interpretation that is not inconsistent with the specification.  It is an interpretation that corresponds with what and how the

16

inventor describes his invention in the specification, i.e., an interpretation that is consistent with the specification.").

There is an obvious and significant difference between two edges being "joined at" something and "joined by" something.  It is a basic principle of claim construction that claim terms should not be construed in such a way as to render claim language meaningless.  *See, e.g.*, *In re Power Integrations, Inc.*, 884 F.3d at 1376 (refusing to construe a claim in such a way that would make claim language "superfluous"); *Bicon, Inc.*, 441 F.3d at 950–51; *Merck & Co.*, 395 F.3d 1372 ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  Here, TOMY's proposed claim construction would render the preposition "at" meaningless. Thus, the Court must adopt a construction of "joined at a bottom surface apex" that accurately reflects the actual claim language, including the preposition "at."

Turning to the specifics of TOMY's proposed construction, TOMY proposes that "joined" be construed as "connected either directly or indirectly by an intervening structure."[4] As is the case with several of TOMY's proposed constructions, TOMY attempts to construe a term—"joined"—by adding extraneous language not supported by intrinsic or extrinsic evidence.

The '209 patent uses the word "joined" in the claim language by stating that the bottom surface of the tub has two seating surfaces, which extend "from respective back rests to distal edges joined *at* a bottom surface apex."  TOMY Br., Ex. 1 at col. 6, ll. 40-45 (emphasis added). TOMY argues that this claim language does not require that the distal edges be "directly connected, i.e., that they touch each other," and instead may "cover either a direct connection, or an indirect connection" such as by an intervening structure.  Essentially, TOMY argues that the

---

[4]     TOMY argues that Summer Infant's definition "requires the distal edges of the seating surfaces physically end and are then physically attached to one another by a joint."  TOMY Br. at 11.  However, Summer Infant has not argued such a construction to this Court.

"bottom surface apex" is an intervening structure, which thus means that the distal edges of the two seating surfaces are joined "indirectly." TOMY Br. at 12. Translating its arguments into the language of this patent, TOMY essentially suggests that "joined at a bottom surface apex" should be construed to mean "joined by a bottom surface apex." TOMY appears to have pulled this interpretation out of thin air. Nowhere in the patent is the bottom surface apex contemplated as a separate structure in and of itself—TOMY's arbitrarily-colored version of Figure 13 notwithstanding. Rather, the "bottom surface apex" is simply the point at which the two distal edges meet. The interpretation of "bottom surface apex" as a point where the edges meet is supported by prosecution history of the '209 patent. As noted *supra*, Claim 22 (Claim 23 in the issued patent) was rejected, in part, for failure to provide antecedent basis for the "disposed at differing inclinations" limitation set forth in Claim 22. In arguing that the specification does provide antecedent basis for that term, TOMY argued to the patent examiner that "surface 64 forms one seating surface . . . and **the other seating surface is formed by surface 70 and the extension of surface 70 that meets surface 64 at apex 66**." TOMY Br., Ex. 4 at 150 (emphasis added). In other words, the prosecution history makes clear that the bottom surface on one side meets the bottom surface on the other side "at apex 66." TOMY did not tell the patent examiner that the two surfaces were joined by some undefined structure that it elected to call an apex. Simply by using "as" rather than "by," TOMY made clear that the edges for a joint at a particular location—specifically, the highest point of the bottom surface of the tub.

TOMY further contends that the doctrine of claim differentiation supports its claim construction. Claim 1 recites a tub with "the bottom surface having two seating surfaces disposed at differing inclinations and extending from respective back rests to distal edges joined at a bottom surface apex." TOMY Br., Ex. 1 at col. 6, ll. 40-45. Claim 18 recites the tub of

claim 1 "wherein the seating surfaces are joined by a central bottom surface portion that rises from the distal edge of one of the seating surfaces to the distal edge of the other of the seating surfaces." *Id*. at col. 7, ll. 44-48. TOMY argues that Claim 1 must cover both direct and indirect connections, because if it did not, claim 1 and claim 18 would cover the same subject matter. This is not so. Simply put, the Court must construe claim 1 in a way that is legally correct. The doctrine of claim differentiation—and the perhaps poorly-drafted language of claim 18—should not lead this Court to conclude differently. The doctrine of claim differentiation "only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1365–69 (Fed. Cir. 2000). "The doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence." *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998)). Thus, because adopting the construction of "joined" put forth by TOMY would improperly broaden the scope of claim 1, as explained *supra*, the doctrine of claim differentiation does not mandate that this Court adopt TOMY's construction. Rather, this Court should adopt a dictionary definition of the word "joined," which is consistent with the claim specification. Merriam-Webster defines "join" as "to come together so as to be connected or united." *See* Ex. 1 at p. 10-13. This broad definition of the term "join" is precisely how the claims in the '209 patent use the word, without reference to any type of direct or indirect connection, and without reference to any intervening structure.

As for the term "bottom surface apex," TOMY argues that "bottom surface apex" should be construed as "a high point." TOMY Br. at 13. TOMY's construction of this term is

nonsensical.  An apex is not *a* high point, but *the* high point; nothing in the patent specification would lead to a different conclusion.  Merriam-Webster defines "apex" as "the highest or uppermost point; summit, top, peak."  *See* Ex. 1 at p. 3-4.  Similarly, Dictionary.com defines "apex" as "the tip, point, or vertex; summit."  *See* Ex. 4 at p. 1-2.  Accordingly, Summer Infant requests that this Court construe "bottom surface apex" consistent with its dictionary definition, as "the high point of the bottom surface."

### D.    Nesting space differential less than about two inches (five centimeters)

TOMY seeks to construe "nesting space differential less than about two inches (five centimeters)" as "the difference in height between n tubs and n+1 tubs is less than approximately two inches (five centimeters)."  For the most part, Summer Infant does not object to TOMY's proposed construction.  However, in its proposed construction, TOMY seeks to substitute the word "approximately" for the word "about."  TOMY offers no reason for this substitution, other than stating, without citation, that "'about' simply means 'approximately.'"  TOMY Br. At 14-15.  Summer Infant does not contest that "about" means "approximately;" rather, Summer Infant sees no reason, and TOMY offers none, why the latter should be substituted for the former in the claim construction.  Thus, Summer Infant objects to the substitution of the word "approximately" for the word "about" in the construction of the term, and otherwise does not object to TOMY's construction.

### E.    Stacking factor less than about 20%

TOMY seeks to construe "stacking factor less than about 20%" as "the stacking factor is the result of the calculation of $(H_{twotubs} - H_{single\ tub})/H_{single\ tub}$ *100, which must be less than approximately 20% (where H = height)."  As argued above, to the extent that TOMY simply substitutes "about" for "approximately," which it states have the same meaning, Summer Infant

objects to the construction, insofar as there is simply no reason to substitute "approximately" for "about," nor does TOMY offer any reason to do so.  However, Summer Infant does not object to the remainder of TOMY's proposed construction of this claim term.

### F.    Wale

| Claim term/phrase at issue | TOMY's proposed construction | Summer Infant's proposed construction |
|---|---|---|
| wale | "a ridge-like structure" | Ordinary meaning: "a horizontal constructional member used for bracing vertical members" |

In its brief, TOMY seeks to have the Court construe a "wale"—what it identifies as the red portions in Figures 4 and 5 of the patent—as a "ridge-like structure."



However, TOMY provides little to no support for its construction of the term.  TOMY cites several portions of the patent—the claims themselves as well as certain language and drawings in the specification—as support for this construction.  Notably, however, the word "ridge" appears nowhere in these cited portions, or anywhere else in the patent itself.  Rather, the claims describe the following:

1)  "wales defining resting points positioned to support the tub on a horizontal surface;"

21

2)   "wales form[ing] laterally aligned sink divided notches at one end of the cavity, and
      laterally aligned ledges at the other end of the cavity;" and

3)   "wales [that] each have longitudinal ends disposed behind the back rests and
      positioned to abut opposite walls of a single sink with the tub rim resting upon an
      upper edge of the sink and the tub disposed within the sink."

Furthermore, the specification describes the bottom of the tub as including "two longitudinal,
parallel wales that define tub resting points," which resting points "include wale end portions at
one end of each wale, and projections at the other end of each wale."  TOMY cites to no actual
portion of the patent describing the wales as "ridge-like structures."

Nor can TOMY cite to *any* intrinsic evidence in support of its proposed construction;
indeed, TOMY disclaimed during prosecution of the patent at issue a definition of the term
"wale" as "a ridge-like structure."  During prosecution of the patent, one of the original proposed
claims, Claim 22 (issued in the '209 Patent as claim 23), described that the cavity of the tub
"includes two side troughs extending along either side of the inclined seats and formed within
wales defining resting points positioned to support the tub on a horizontal surface, the wales
forming laterally aligned sink divider notches at one end of the cavity, and laterally aligned
ledges at the other end of the cavity."  TOMY Br., Ex. 4 at 20.  On May 30, 2002, the Patent
Examiner rejected Claim 22 as anticipated by a British patent application Sidman *et al.*, GB
2,193,887 ("Sidman"), which was found by the Patent Examiner.  The Patent Examiner stated
that the Sidman reference disclosed a tub comprising, in part, "two wales . . . forming side
troughs," and that this was the basis for rejecting Claim 22.  TOMY Br., Ex. 4 at 112-113.

On August 29, 2002, TOMY sent a letter to the Patent Examiner requesting
reconsideration of the rejection of Claim 22 as anticipated by Sidman.  TOMY argued that

Sidman did not anticipate Claim 22, because the wales described in Claim 22 defined "resting points positioned to support the tub on a horizontal surface." *Id*. at 151.  In contrast, TOMY argued, the Sidman reference disclosed a tub with resting points formed by "legs 54 and 58 extending downward from the lower surfaces of the wales . . . not by the wales themselves." *Id*. The legs identified by TOMY in the Sidman reference can be seen in the drawing below, labelled as 54 and 58:



TOMY argued that these "legs," labelled as 54 and 58, were not part of the wales.  For this reason, TOMY argued that Sidman was not anticipatory.  *Id*.  In other words, TOMY's argument that Sidman was not anticipatory was based on the Sidman tub resting on legs protruding from the wales, rather than resting on the wales themselves.

Given TOMY's argument during the prosecution of this patent, its attempt to define "wales" as "ridge-like structures" is simply nonsensical.   If the meaning of "wale" was "ridge-like structure," the legs in the Sidman reference would be a part of the wale—the "legs" of the tub in the Sidman reference clearly appear to be part of the portion of the tub that extends downward from the main body of the tub.  But TOMY argued during patent prosecution that these portions of the tub could *not* be considered the wales, but rather legs extending downward from the wales.  TOMY cannot have it both ways.  TOMY attempted to escape patent rejection by defining a wale such that the legs of the Sidman reference would not be a part of the wale. TOMY's construction impermissibly seeks to recapture subject matter scope disclaimed during prosecution of the '209 patent.  *See, e.g.*, *Omega Eng'g*, 334 F.3d at 1323; *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1581, 34 U.S.P.Q. 2d 1673, 1681 (Fed.Cir.1995) (the patentee, having distinguished a prior art reference in arguments made to the USPTO, "cannot now escape [the defendant's] reliance upon this unambiguous surrender of subject matter").

In contrast, Summer Infant's proposed dictionary definition is consistent with the patent and its prosecution history.  Merriam-Webster defines a "wale" as "a horizontal constructional member (as of timber or steel) used for bracing vertical members."  *See* Ex. 1 at p. 14-15. Similarly, the McGraw-Hill Dictionary of Engineering (2d Ed.) (2003) defines a "wale" as "[a] horizontal reinforcement utilized to keep newly poured concrete forms from bulging outward." *See* Ex. 3 at p. 3.  This is the how the wales in the tub described in the '209 patent function: they are horizontal plastic portions of the tub that support the tub and prevent the body from being too flexible.  *Renishaw PLC*, 158 F.3d at 1250 (reasoning that a claim interpretation that aligns with the purpose of the invention is likely to be correct).  Accordingly, Summer Infant request that this Court reject TOMY's construction of "wale," which is inconsistent with TOMY's

24

representations to the Patent Examiner during prosecution, and accept Summer Infant's dictionary definition of "a horizontal constructional member used for bracing vertical members."[5]

## III.   CONCLUSION

For the reasons stated above, Summer Infant respectfully requests that this Court reject TOMY's proposed claim constructions and adopt Summer Infant's constructions.


Dated: June 12, 2019

Plaintiff and Counterclaim Defendant,
Summer Infant (USA), Inc.,

By its attorneys,

/s/ Jeffrey K. Techentin
Jeffrey K. Techentin [No. 6651]
jtechentin@apslaw.com
Jamie J. Bachant [No. 8800]
jbachant@apslaw.com
Casey White Bassett [No. 9803]
cbassett@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: 401-274-7200
Fax: 401-351-4607

---

[5]     Should the Court favor TOMY's proposed construction and elect to construe "wale" as a ridge-like structure, it should clarify that the ridge-like structure does not include legs or similar protrusions extending downward from the wales because TOMY has "by implication surrender[ed] such protection."  *Ekchian*, 104 F.3d at 1304.

### CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2019, I filed the within through the ECF system and that notice will be sent electronically to all counsel who are registered participants identified on the Mailing Information for C.A. No. 1:17-cv-549-JJM-PAS.

/s/ *Jeffrey K. Techentin*

958266.v1