# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

SUMMER INFANT (USA), INC.,  :
   Plaintiff/Counter Defendant, :
            :
v.           :  C.A. No. 17-549JJM
            :
TOMY INTERNATIONAL, INC.,  :
   Defendant/Counter Claimant. :

## REPORT AND RECOMMENDATION
## REGARDING CLAIM CONSTRUCTION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

U.S. Patent No. 6,578,209 ("'209 Patent"), titled "Tubs for Bathing Infants and

Toddlers," issued on June 17, 2003. Defendant TOMY International, Inc. ("TOMY") owns the

'209 Patent by assignment. The American subsidiary of a global toy company, TOMY sells an

infant/toddler bathing tub, the "Sure Comfort Deluxe Newborn to Toddler Tub" (the "TOMY

Tub"), which it contends is protected by the '209 Patent.

Plaintiff Summer Infant (USA), Inc., ("Summer Infant") designs, markets and distributes

infant/toddler products sold principally to large U.S. retailers. In 2017, Summer Infant was

selling an infant/toddler bathing tub (the "Accused Product") it had designed, which competed

with the TOMY Tub. On November 14, 2017, TOMY sent Summer Infant a cease and desist

letter, asserting that the Accused Product infringes the '209 Patent. Summer Infant responded by

initiating this action for a declaration that the Accused Product does not infringe the '209 Patent;

Summer Infant alleges that, at a minimum, the Accused Product does not have "two seating

surfaces disposed at differing inclinations and extending from respective back rests to distal

edges joined at a bottom surface apex," which limitation is common to every independent claim

of the '209 Patent. See ECF No. 1-1 ("'209 Patent"). TOMY counterclaimed for infringement;

it alleges that the Accused Product meets the limitations of several claims of the '209 Patent, either literally or under the doctrine of equivalents.

Based on TOMY's motion (ECF No. 34),[1] the matter is now before the Court for claim construction pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 372 (1996). In its claim construction brief, TOMY initially asked the Court to construe six disputed terms. During the hearing, the construction of two terms was resolved by agreement,[2] leaving four in issue. For one of the four in issue, TOMY has withdrawn its proposed construction and now asks the Court to construe it as "self-defining" based on its features as set out in the '209 Patent, while Summer Infant has proposed a construction that it argues is based on the ordinary meaning. The construction of these four terms is referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[3]

## I.  BACKGROUND

TOMY alleges that the Accused Product infringes independent Claims 1, 23, and 30, as well as dependent Claims 2-8, 12, 15, 18, 21, 24-29 and 31. All of these claims contain one or

---

[1] Summer Infant has not asked the Court specially to construe any term. It argues that the Court should adopt the plain and ordinary meaning as understood by persons of skill in the art in accordance with the pertinent intrinsic evidence and should reject TOMY's proposed constructions as inconsistent with plain and ordinary meaning.

[2] Based on the potential for a dispute over the meaning of "about" used as an adjective to qualify numeric values in two phrases – "nesting space differential of less than **about** two inches" and "stacking factor of less than **about** 20 percent" – TOMY included these phrases in its list of terms to be construed. '209 Patent, col. 6, lines 50-51; <u>id.</u> col. 8, lines 4-5 (emphasis supplied). However, consistent with cases from the Federal Circuit, the parties agree that the plain meaning of "about" in this context is synonymous with "approximately," as well as that it would be incorrect to assign a specific numerical value to limit either phrase. <u>E.g.</u>, <u>Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.</u>, 476 F.3d 1321, 1326 (Fed. Cir. 2007); <u>Merck & Co. v. Teva Pharms. USA, Inc.</u>, 395 F.3d 1364, 1372 (Fed. Cir. 2005). Based on this agreement, there is no need for the Court to construe "about" as it is used in these phrases.

[3] Cases differ regarding whether claim construction is a non-dispositive matter that may be referred to a magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A), or is analogous to a dispositive issue that must be referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). <u>Compare</u> <u>R&J Mfg. Co. v. First Card, Inc.</u>, C.A. No. 15-200M, 2017 WL 8234397, *1 n.1 (D.R.I. July 18, 2017), <u>with</u> <u>InMusic Brands, Inc., v. Roland Corp.</u>, C.A. No. 17-010-JJM-LDA, 2019 WL 3532068, at *1 (D.R.I. Aug. 2, 2019). It is a difference without distinction because claim construction is a matter of law. Because TOMY's motion was referred for report and recommendation, I have dealt with it pursuant to 28 U.S.C. § 636(b)(1)(B).

more of the terms to be construed. The parties' positions regarding the terms in issue may be briefly summarized by the chart below, which is adapted from the charts in Summer Infant's brief (ECF No. 36 at 4-5) and in TOMY's hearing Exhibit A:

| Claim term/phrase | TOMY's Proposed Construction | Summer Infant's Proposed Interpretation |
|---|---|---|
| "Molded plastic body" | "one-piece plastic body formed from a mold" | Ordinary meaning: "a plastic body formed from one or more molds" |
| "Seating surface(s)" | "a surface that supports the posterior or buttocks of the user when seated" | Ordinary meaning: "a surface that, in combination with a back rest, forms a seat" |
| "Distal edges joined at a bottom surface apex" | "areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an intervening structure at a high point of the bottom surface of the body between the seating surfaces" | Ordinary meaning: "lines or points situated away from a back rest, connected at the high point of the bottom surface" |
| "Wale" | Self-defining[4] | Ordinary meaning: "a horizontal constructional member used for bracing vertical members" |

The '209 Patent's Detailed Description describes the preferred embodiment in Figures 9 and 14 (which is referenced in Figure 9), and Figure 13; these are a useful reference for the terms in issue:

---

[4] TOMY originally asked the Court to construe this term to mean "a ridge-like structure." At the hearing, it shifted course and now asks for a construction based on the description of the "wale" as set out in the patent.



**FIG. 9**



**FIG. 14**



**FIG. 13**

## II.    CLAIM CONSTRUCTION PRINCIPLES

The construction of claim terms is a question of law.  Markman, 517 U.S. at 372; R&J Mfg., 2017 WL 8234397, at *2-3.  As settled by Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc), the guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  Id. at 1313; see Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Meaning is properly derived from "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  Phillips, 415 F.3d at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

Claim construction begins with the claims themselves; they "define the invention to which the patentee is entitled the right to exclude."  Id. at 1312.  If the ordinary meaning of a claim term is readily apparent, claim construction involves little more than the application of the widely accepted meaning of commonly understood words.  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1361 (Fed. Cir. 2008) (court may construe a claim term to have plain meaning when such a construction resolves dispute between the parties); Alifax Holding Spa v. Alcor Sci. Inc., C.A. No. 14-440S, 2017 WL 1533430, at *1 (D.R.I. Apr. 27, 2017) ("The words of the claims are given their ordinary and customary meanings, unless a word or phrase is expressly defined in the patent to mean something else.").  However, the determination that a claim term needs no construction may be inadequate when a term has more than one ordinary meaning or when reliance on ordinary meaning does not resolve the parties' dispute.  O2 Micro Int'l, 521 F.3d at 1361.

"The claims, of course, do not stand alone."  Phillips, 515 F.3d at 1315.  "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims."  Id.  For that reason, "the specification is always highly relevant to the claim construction analysis."  Id. (quoting Vitronics, 90 F.3d at 1582).  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  Id. at 1316 (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification.  On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[C]laims cannot be of broader scope than the invention that is set forth in the specification.");  Phillips, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part.");  Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims").  On the other hand, "limitations from the specification are not to be read into the claims."  Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).  While the specification can be used to interpret the claims, the court must be wary of confining the claims to the embodiments described in the specification.  Phillips, 415 F 3d at 1323; see CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1367 (Fed. Cir. 2002) ("The drawings merely illustrated a particular embodiment.").  Nevertheless, if the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, the inventor's lexicography governs.  Phillips, 415 F.3d

at 1316. A claim construction that excludes the preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support." <u>Vitonics</u>, 90 F.3d at 1583.

In addition to the claims and the specification, intrinsic evidence may also include the prosecution history to the extent that it bears on the scope of the invention, although the prosecution history is "less useful for claim construction purposes than the claim language and written description." <u>Avid. Tech., Inc. v. Harmonic, Inc.</u>, 812 F.3d 1040, 1045 (Fed. Cir. 2016). Construction of claims may also be guided by extrinsic evidence such as expert testimony and dictionary definitions to the extent they are "helpful in determining the 'true meaning of language used in the patent claims.'" <u>Phillips</u>, 415 F.3d at 1317-19. However, such extrinsic evidence is viewed as less reliable and may not control if it contradicts the intrinsic record. <u>Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC</u>, 824 F.3d 999, 1002-03 (Fed. Cir. 2016). The court must discount expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history. <u>Phillips</u>, 415 F.3d at 1318.

Once the proper meaning of a term is established, that term must have the same meaning for all claims in which it appears. <u>Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.</u>, 309 F.3d 1365, 1371 (Fed. Cir. 2002). And if two alternative interpretations of particular claim language are equally plausible, the court should choose the narrower interpretation to avoid unfair surprise to the public. <u>Athletic Alts., Inc. v. Prince Mfg., Inc.</u>, 73 F.3d 1573, 1581 (Fed. Cir. 1996) (broader interpretation of two alternatives undermines fair notice function of patent). This approach is particularly apt when the "ambiguity is the result of sloppy drafting," so that "[c]laim construction then becomes a game of crystal ball gazing, not resolved until this

court's gaze is announced." <u>3M Innovative Props. Co. v. Tredegar Corp.</u>, 725 F.3d 1315, 1334-35 (Fed. Cir. 2013) (Plager, J., concurring).

## III.    ANALYSIS OF DISPUTED CLAIMS

### A.    "Molded Plastic Body"

The first term – "molded plastic body" – appears in the opening sentence of each of the independent claims in issue and also applies to all of the asserted dependent claims.  TOMY seeks to limit the meaning of "molded plastic body" by a construction that specifies that the "molded plastic body" is one-piece and that it is formed from one mold – TOMY's proposed construction is: "one-piece plastic body formed from a mold."  Summer Infant asks the Court to adopt a broader construction that is silent regarding whether the body is a single piece, but that specifies that the body is "formed from one or more molds."  ECF No. 36 at 5.

In this instance, the disputed term is modified by the singular indefinite article – "a." Therefore, I begin with the Federal Circuit's guidance on the meaning of the singular article: "as a general rule, the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.'" <u>Transocean Offshore Deepwater Drilling, Inc. v. Pac. Drilling, Inc.</u>, Civil Action No. H-13-1088, 2015 WL 3422410, at *32 (S.D. Tex. May 27, 2015) (citing <u>TiVo, Inc. v. EchoStar Commc'ns Corp.</u>, 516 F.3d 1290, 1303 (Fed. Cir. 2008)).  However, there are also "exceptions to this rule . . . 'where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule.'" <u>Id.</u> (quoting <u>01 Communique Lab., Inc. v. LogMeIn, Inc.</u>, 687 F.3d 1292, 1297 (Fed. Cir. 2012)).  Whether "a" or "an" is treated as singular or plural depends heavily on the context of its use and the general rule does not apply when the context clearly evidences that the usage is limited to the singular.  <u>TiVo, Inc.</u>, 516 F.3d at 1303.

Here, as TOMY points out, the '209 patent's "Detailed Description" in the specification contains language expressly stating that every embodiment described in the patent contains a one-piece body: "The polypropylene body of the tub 10 is molded **as one-piece**." '209 Patent, col. 6, lines 2-3 (emphasis supplied). The reference to "tub 10" is a reference to the body of the tub, as described in the "Detailed Description" and as depicted in the drawings of the tub body. E.g., id. Fig. 9. As used in the specification, "tub 10" is a ubiquitous reference to every iteration of the tub body. The drawings in the specification portion of the '209 Patent also uniformly depict a one-piece molded body. See id. Fig. 4, 5, 9, 13, 14. The specification's abstract is consistent with this construction: "the tub is molded of a shape enabling multiple tubs to nest." Id. at 1. TOMY has also presented extrinsic evidence to confirm its proposed construction. ECF No. 35-5 ("Catignani Decl."). Its expert, Bert F. Catignani, opines that a person skilled in the art would understand that the '209 Patent describes a molded body that is "monolithic, i.e., single piece." Id. ¶¶ 5-6.

TOMY's proposed construction is confirmed by Retractable Techs., Inc. v. Becton, Dickinson & Co., 653 F.3d 1296, 1305 (Fed. Cir. 2011), which holds that, when the specifications describing the invention expressly state that each embodiment contains a one-piece body and do not disclose a body that consists of multiple pieces or indicate that the body is anything other than a one-piece body, the court's construction may be guided by the specification. In such circumstance, this does not amount to the improper importation of a limitation from the specification into the claims. Id. Accordingly, I adopt TOMY's construction that "molded plastic body" means a "one-piece plastic body formed from a mold." See Phillips, 415 F.3d at 1317 ("It is therefore entirely appropriate for a court . . . to rely heavily on the written description for guidance as to the meaning of the claims."); SciMed Life Sys., Inc. v.

Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature.").

Summer Infant's argument that the Court should inject "one or more" to modify "mold" does not fare as well. For starters, this meaning does not derive from the '209 Patent. While the mold used to form the body is mentioned repeatedly, never is it described as being "one or more" molds. Further, the indefinite article "a" as used in the claims in connection with this term modifies "molded plastic body." It does not modify "mold." To the contrary, "mold" or "molded" appears in the '209 Patent as an adjective or a verb to describe how the body is formed. E.g., '209 Patent, col. 1, lines 32-33 ("Our invention features a tub having a molded plastic body"); id., col. 3, lines 3-4 ("The body may be molded of various resins, including polypropylene"). Therefore, the interpretation that "a" means "one or more," as the Federal Circuit has held, for example, in TiVo, Inc., is simply not applicable. I decline to recommend adding this extraneous language to this term, which is foundational to all of the claims that are in issue. See Hoganas AB v. Dresser Indus., Inc., 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.").

B. "Seating Surface(s)"

Independent Claims 1, 23, and 30 each recite that the bottom surface of the tub has "two seating surfaces disposed at differing inclinations and extending from respective back rests to distal edges, . . . each seating surface forming, together with a respective one of the back rests, an

inclined seat." '209 Patent, col. 6, lines 41-46; id., col. 8, lines 12-18; id., col. 9, lines 1-6.  On

the infant side of the tub, the specification describes "a tub bottom surface 64 extends upward

generally at an angle $é_1$ of about 45 degrees and forms a seating surface associated with back rest

62, with apex 66 received behind the knees of the infant."  Id., col. 5, lines 46-51.  For the

toddler side, the specification states that, "[a]t the other end of the tub[,] . . . an opposing back

rest 68 extends generally at the angle of $É_2$ of about 77.5 degrees and serve as a back rest for a

toddle [sic] seated on generally horizontal seating surface 70."  Id., col. 5, lines 51-54.  With

respect to the "seating surface," the prosecution history is consistent with the claims and

specification in that it includes the applicant's assertion that "surface 64 forms one seating

surface, extending at inclination angle . . . and the other seating surface is formed by surface 70

and the extension of surface 70 that meets surface 64 at apex 66."  ECF No. 35-4 at 150

("Prosecution History").

Despite this intrinsic evidence, TOMY asks the Court to construe "seating surface(s)" by

reference to function, limiting the term to only the part of the seat used to "support[] the posterior

or buttocks of the user when seated."  ECF No. 35 at 2.  For the toddler side of the tub, TOMY

believes that this construction would have the effect of limiting the term "seating surface" to

encompass only part of the portion of bottom of the tub that extends from the back rest to the

apex, excluding the portion that extends from the horizontal portion the rest of the way to the

distal edge, which joins the other seating surface at the apex.

A big problem with this construction is that it is derived from neither the written nor the

sketched portions of the intrinsic evidence.[5]  Hon Hai Precision Indus. Co. v. PSC Computer

---

[5] Importantly, TOMY's two proposed new terms ("posterior" and "buttocks") have meanings that are neither synonymous nor settled and would inject ambiguity into the meaning of "seating surface." See Cypress Semiconductor Corp. v. GSI Tech., Inc., Case Nos. 13-cv-02013-JST, 13-cv-3757-JST, 2014 WL 3735903, at *5 (N.D. Cal. July 29, 2014) (resolving dispute between two constructions and rejecting that which is more likely to

Prod., Inc., Nos. CV 03-0093-SVW (Mcx), CV 03-0094-SVW (Msx), 2003 WL 25902414, at *7 (C.D. Cal. Aug. 6, 2003). Defining the "seating surface" by reference to the human body part it supports is a construction that darkens the clouds of confusion, rather than dispersing them. Summer Infant's expert declaration concisely captures the problem, noting that the ordinary usage of "seating surface" covers the portions of the seat not made up by the back rest, "which could include areas of the seat touched by other portions of the user's body, such as the legs." ECF No. 41-9 ¶ 3 ("Aprea Decl.").

More substantively, TOMY's proposition is squarely contradicted by the plain words used in the independent claims: "seating surfaces . . . extending from respective back rests to distal edges joined at a bottom surface apex." E.g., '209 Patent, col. 6, lines 41-46. Put differently, the ordinary and plain meaning of the words used in Claims 1, 23 and 30 are clear that the "seating surface" is the portion of the inclined seat that extends from the back rest to the apex. Accordingly, I do not recommend that the Court adopt TOMY's recommended construction.[6]

Summer Infant's suggested construction of "seating surface(s)" is also rejected. Summer Infant asks the Court to construe "seating surface" redundantly as "a surface that, in combination with a back rest, forms a seat." ECF No. 36 at 4. The proposition that the "back rest" and "seating surface" are separate is already crystal clear in Claim 1, which describes each "seating

---

introduce ambiguities). For example, "posterior" could be defined as "the hinder parts of the body," that is, any part of the body from head to heel that is not the front; whereas "buttocks" may narrowly reference only "the back of a hip that forms one of the fleshy parts on which a person sits." Compare Posterior, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/posterior, with Buttock, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/buttock.

[6] This determination is confirmed by the '209 Patent's prosecution history. See Phillips, 415 F.3d at 1317. When asked by the examiner to further clarify what was meant by "disposed at differing inclinations" in what is now Claim 23, the applicant explained that "[w]ith respect to the two seating surfaces 'disposed at differing inclinations' . . . surface 64 forms one seating surface . . . and the **other seating surface is formed by surface 70 and the extension of surface 70 that meets surface 64 at apex 66**." Prosecution History at 150 (emphasis supplied).

surface" as a "surface forming, together with a respective one of the back rests, an inclined seat." '209 Patent, col. 6, lines 45-46.  Further, TOMY rightly critiques Summer Infant's addition of a new word – "combination" – because it may well inject confusion into what is already straightforward.

Based on the foregoing, I find that the term "seating surface(s)," as described in the '209 claims, is clear and does not require further construction.  "Seating surfaces" plainly mean the inclined (for the infant side) and generally horizontal (for the toddler side) portions of the bottom surface that extend from the respective back rests to the central apex of the bottom surface. Together with their respective back rests, each seating surface forms "an inclined seat." E.g., col. 6, lines 45-46.  This approach is confirmed by Summer Infant's expert, Michael Aprea, who opined that "seating surface," as used in this patent, is readily understood by a person of ordinary skill in the art.  Aprea Decl. ¶ 3.  My recommendation is that the Court find there is no need for to intervene.[7]  O2 Micro Int'l, 521 F.3d at 1361 (plain meaning may be adopted if it resolves dispute between the parties); Alifax Holding Spa, 2017 WL 1533430, at *1 ("The words of the claims are given their ordinary and customary meanings, unless a word or phrase is expressly defined in the patent to mean something else.").

### C.     "Distal Edges Joined at a Bottom Surface Apex"

TOMY requests that the phrase "distal edges joined at a bottom surface apex," which appears in independent Claims 1, 23 and 30, be construed as "areas of the seating surfaces situated furthest away from their respective back rests are connected directly or indirectly by an

---

[7] In its brief, TOMY colored in yellow the portion of Figure 13 that it contends is not part of the toddler-side surface.  ECF No. 35 at 9.  Summer Infant argues with equal vigor that the yellow portion is part of the toddler-side seating surface.  While TOMY's colored-in version of Figure 13 is not evidence, it has been a useful aid to facilitate the Court's understanding of the concepts in issue.  To clarify my recommendation by reference to this aid, I find that the area depicted in yellow in TOMY's brief, id., is a portion of the seating surface.

intervening structure at a high point of the bottom surface of the body between the seating surfaces." ECF No. 35 at 10. Summer Infant requests that the phrase be construed as "lines or points situated away from a back rest, connected at the high point of the bottom surface." ECF No. 36 at 11. Within this phrase, the following terms are at issue: (1) "distal edges"; (2) "joined at"; and (3) "bottom surface apex." The phrase appears in the context of other key terms: "two seating surfaces disposed at differing inclinations and extending from respective back rests to distal edges joined at a bottom surface apex." E.g., '209 Patent, col. 6, lines 41-44. As confirmed by the drawings, especially Figure 14, the "apex" (66) is a curving surface that is the highest portion of the bottom surface of the tub. Id., Fig. 14. The specifications provide that this curvature of the "apex" is "similar to the curvature of the infant seating surface." Id., col. 5, lines 64-67.

*Distal Edges*. The term "distal edges" in the '209 Patent refers to the portion of each of the seating surfaces that is farthest[8] from the respective back rests. The parties do not dispute that the patent uses "distal" consistent with its ordinary meaning to designate the area located farthest from the designated point of reference (the back rests). See ECF No. 35-6 at 3; ECF No. 36-1 at 7. They also essentially agree that "edge" signifies a border, defined as "the line or point where a material object or area begins or ends," or "the portion of the surface of an object or area that is adjacent to its border." ECF No. 36-1 at 9. In the applicable cases, the term "edge" is generally seen as one whose meaning does not require construction. For example, in Julius Zorn,

---

[8] The parties interchangeably use "furthest" and "farthest" to capture this concept. I have used "farthest" based on etymology research suggesting that, in this setting, "farthest" is more commonly used to refer to a physical distance from a point. See Farther vs. further, LawProse, available at https://www.lawprose.org/lawprose-lesson-135-farther-vs-further/ ("*Farther* refers to physical distances . . . *Further*, on the other hand, refers to figurative or metaphorical distances."); Difference Between Farthest and Furthest, DifferenceBetween.net, available at http://www.differencebetween net/language/difference-between-farthest-and-furthest/ ("'Farthest' describes physical distance . . . 'Furthest' is used to describe a greater degree."); but see Farther, farthest or further, furthest, Cambridge Dictionary, available at https://dictionary.cambridge.org/us/grammar/british-grammar/farther-farthest-or-further-furthest ("There is no difference in meaning between them.").

Inc. v. Medi Mfg., Inc., Case No.: 3:15-CV-02734-GPC-RBB, 2017 WL 960413, at *17 (S.D. Cal. Mar. 13, 2017), the court held that the plain and ordinary meaning of "proximal and distal edges" is "top and bottom edges." Id.; see Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC, 731 F. Supp. 2d 418, 424 (M.D. Pa. 2010) (declining to construe the term "edge" in claim phrase "distal edge" as it requires no special definition; "any jury would readily understand the meaning of the word 'edge'"); Kimberly-Clark Corp. v. Tyco Int'l, Inc., No. 98-C-0756-C, 1999 WL 33944112, at *4 (W.D. Wis. Nov. 1, 1999) ("distal edge [means] the edge furthest from" a specified portion of a product).

Summer Infant's insistence that these sources mandate strictly limiting "edge" to a one-dimensional line or point is simply wrong. Its own proffered definitions of "edge" make it clear that "edge" also means a "portion" of a surface. ECF No. 36-1 at 7; ECF No. 36-2 at 9 ("that portion of the surface of any object . . . adjacent to its boundary"). Summer Infant's fear that treating the "edge" as two-dimensional (i.e., an "area") would allow TOMY to claim up to the entire seating surface as its edge is a false construct. Such ambiguity simply cannot be drawn from the term "edge" as it is customarily understood.

As in First Quality Baby Prods., LLC, 731 F. Supp. 2d at 424, I find that "edge" needs no further definition. Therefore, "distal edge" means "edges of the seating surfaces situated farthest away from their respective back rests."

*Joined At.* The parties agree that the meaning of "joined" includes "connected." ECF No. 35 at 11; ECF No. 36 at 19. However, they dispute whether the patent claims that the distal edges of each seating surface are connected directly, that is, edge-to-edge, or whether the patent also claims indirect joinder, that is, with edges meeting on either side of an intervening structure designated as the central bottom surface portion.

Summer Infant argues that "joined at" means that the seating surfaces meet to form the apex, and that the inventor's choice of "joined" with the preposition "at" precludes any other meaning. In support of this interpretation, it marshals the ordinary meaning of the words, referencing the Merriam-Webster dictionary, whose definition specifies that "joined" means "to put or bring together and fasten, connect, or relate so as to form a single unit, a whole, or a continuity." ECF No. 36-1 at 13. This source further specifies that "join" usually "suggests strongly the idea of physical . . . contact." Id. at 14. In the only portion of the definition that contemplates "joining" to mean less than physical contact, the preposition "by" is introduced to reflect an intervening structure: "to connect (as points) by a line." Id. at 13. And the same definition adverts to the use of the preposition "at" to denote the joinder of two entities, not the introduction of a third. See id. ("ADJOIN: <**at** this point the two estates ~ >") (emphasis supplied). Summer Infant's expert, Mr. Aprea, reinforces this proposition: "'joined at' . . . means that the two surfaces are touching at the point where they are joined, and not that the two surfaces are joined by some intervening structure." Aprea Decl. ¶ 4.

TOMY agrees that it claims an embodiment in which the seating surfaces join directly, but argues that the term "joined at" must be broadly interpreted to cover "indirect" joinder, as claimed by dependent Claim 18, which describes "a central bottom surface portion," '209 Patent, col. 7, line 45, as an intervening structure between the distal edges of the seating surfaces. Based on its coloration of Figure 13 in its brief, it further contends that its preferred embodiment has an intervening structure and that the Court must eschew a construction that excludes the preferred embodiment. See Adams Respiratory Therapeutics, Inc. v. Perrigo Co., 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment is rarely, if ever, correct."); AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1242 (Fed. Cir. 2003)

("[I[ndependent claims . . . [are] at least as broad as the claims that depend from them."). The problem is that TOMY points to nothing in the claims, specification or prosecution history to buttress such an amendment to the customary and usual meaning of "joined at." Importantly, dependent Claim 18 materially alters the words chosen for independent Claims 1, 23 and 30, in that it omits the references to "edges" and recites that the "seating surfaces are joined **by** a central bottom surface portion."[9] '209 Patent, col. 7, lines 44-46 (emphasis supplied). This contrasts with the words chosen for independent Claims 1, 23 and 30 – "**edges** [of the seating surfaces] joined **at** a bottom surface apex." E.g., id. at col. 6, lines 43-44 (emphasis supplied).

I find it impossible to avoid the force of Summer Infant's argument that "joined at," as the term appears unadorned by further definition in Claims 1, 23 and 30, describes clearly the joinder of the two distal edges to each other at the apex; it does not encompass indirect joinder of the two seating surfaces to a third intervening structure, as claimed by dependent Claim 18. I further find that the preferred embodiment described in the specification and depicted in the drawings is consistent with Summer Infant's interpretation, including that, on the toddler side, the seating surface is described and shown as the entirety of the portions extending from the back rest to the apex. That is, as displayed on Figure 13, the portion between what is labelled as 70 (the "generally horizontal" portion of the "seating surface") and 66 (the "apex") is not designated as an intervening structure, but rather is described and depicted as an extension of 70, which joins the other seating surface at the apex (66). The prosecution history aligns with this

---

[9] TOMY argues that the Court should deploy the doctrine of claim differentiation in interpreting "joined at" to conclude that "joined at" in Claims 1, 23 and 30 must be interpreted as broadly including the alternative embodiment in Claim 18. Citing Comark Commc'ns., Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998), Summer Infant contends that the correct approach to construction means only that Claim 18 is different. Id. ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."). Finding "joined at" to be clear, as described in the text, I decline to resort to reliance on claim differentiation to "override clear statements of claim scope found in the specification and prosecution history." Poly-Am., L.P. v. API Indus., Inc., 839 F.3d 1131, 1137 (Fed. Cir. 2016) ("[C]laim differentiation does not serve to broaden claims beyond their meaning in light of the patent as a whole.").

construction and includes the statement that the two seating surfaces "meet[]" at the apex.
Prosecution History at 150.

To summarize, while "connected," as the parties agree, is a perfectly good synonym for "joined," the inventor chose "joined," which, when followed by "at," has a plain and ordinary meaning that is readily understood by a jury; accordingly, I do not adopt Summer Infant's construction that "connected" should be swapped for "joined." Further, mindful of the lack of words or drawings that alter the plain meaning of "joined at," coupled with prosecution history making clear that the term means that the edges "meet," I reject TOMY's construction that "joined at" contemplates the introduction of a third intervening structure between the two seating surfaces. Therefore, I find that "joined at" need not be construed except to clarify that the edges are joined to each other.

*Bottom Surface Apex.* TOMY argues that the term "apex" means "**a** high point." ECF No. 37 at 11 (emphasis supplied). Summer Infant argues that it means "**the** high point," as in the high point of a pyramid. ECF No. 36 at 20 (emphasis supplied). As depicted in Figure 14, surface 66 denotes the "apex"; it is clearly depicted not as the sharp point of a pyramid, but as a curved surface stretching across most of the tub's width. The specification is consistent with this, explaining that the "apex" referenced in independent Claims 1, 23 and 30 is not a single point but rather is a curved surface with its outer portions higher than the midportion, spanning the width of the tub bottom (as when referring to the apex of an elongated mound). '209 Patent, Figs. 13, 14. As the specification further provides, the curvature of the apex is "similar to the curvature of the infant seating surface." Id., col. 5, lines 64-67. Accordingly, it is clear that "apex" must be construed to mean a surface that is higher than the other portions of the tub's bottom surface, located between the seating surfaces. See Phillips, 415 F.3d at 1316 (quoting

Renishaw PLC, 158 F.3d at 1250).  Further, the specification clearly describes the "apex" as the surface "received behind the knees of the infant," '209 Patent, col. 5, lines 49-51, while the drawings consistently depict an apex that not only forms a wide downward curve (like a smile) across the width of the tub (Fig. 14), but also (from the view of Fig. 13) that consists of an area that gently curves upward (like a frown) and back down over the peak of the bottom surface.  It appears as an area, albeit a narrow area, and is not limited to a line or point, as Summer Infant contends.

Based on the foregoing, I recommend that the Court construe "distal edges joined at a bottom surface apex" as "edges of the seating surfaces situated farthest away from their respective back rests joined to each other at the area of a high point of the bottom surface of the body between the seating surfaces."

### D.    Wale

"Wale" does not appear in independent Claim 1, but is embedded in dependent Claims 2, 3, 5 and 6, as well as independent Claims 23 and 30.  These Claims contain a detailed description of the "wale" as a cavity (one on each side of the tub) that houses "troughs extending along either side of the inclined seats," the bottoms of which are "defining resting points" ("ledges" on one end of the tub and "notches" on the other) that allow the tub to rest horizontally when placed on a countertop.  '209 Patent, col. 6, lines 52-67, to col. 7, lines 1-6; id., col. 8, lines 19-27; id., col. 9, lines 7-11; see also id., col. 4, lines 50-55 (specification describes "longitudinal, parallel wales [] that define tub resting points," with "wale end portions [] at one end of each wale," and "projections [] at the other end").  The wales are depicted as 26 in Figures 4 and 5 as follows:



FIG. 4

FIG. 5

At the hearing, TOMY wisely abandoned its proposed construction of this term as "a ridge-like structure" and now asks the Court to define it by reference to its features as specified in each pertinent claim. While Summer Infant has directed the Court to dictionary definitions of "wale," ECF No. 36-1 at 16, it concedes that these are not helpful in that the meaning of "wale" as used in the '209 Patent is not captured by any of these definitions.[10] Summer Infant's real concern seems to be making certain that the references to "wale" do not claim the protrusion of legs or feet. However, TOMY's proposal would not stretch so far; rather, it picks up the claimed features of the "wales," which include "resting points positioned to support the tub on a horizontal surface," which are further described in the claims as "sink divider notches at one end of the cavity, and laterally aligned ledges at the other end of the cavity," or as "longitudinal ends

---

[10] Summer Infant's dictionary submission reveals that the meaning of "wale" ranges widely depending on context. Id. For example, to a physician, it can mean a streak or ridge on the skin, but to a mariner, it is the planks on the side of a wooden boat, and to a knitter, it is a row of loops, while to a seamstress, it denotes the texture of a fabric (such as corduroy). Id.; see also Aprea Decl. ¶ 5 (averring that the expert is unfamiliar with "wale" in the context of a child's tub).

disposed behind the back rests," '209 Patent, col. 6, lines 54-67, and in the specification as "wale end portions" and "projections."  Id., col. 4, lines 53-55.  These words do not claim "legs" or "feet," nor are these features depicted as "legs" or "feet" in the specification.

The term "wale," as used in the '209 Patent, has a meaning unique to this patent that is not specially defined, but it is closely and clearly described in the pertinent claims.  Accordingly, I recommend the approach proposed by TOMY – that the term is self-defining based on the language used in the pertinent claims to describe the "wales."

## IV.    CONCLUSION

For the reasons given above, I recommend that TOMY's motion (ECF No. 34) for Claim Construction Order be granted in part and denied in part.  I further recommend that the Court should adopt the following constructions:

| Disputed Term or Phrase | Recommended Construction |
|---|---|
| "molded plastic body" | "one-piece plastic body formed from a mold" |
| "seating surface(s)" | Ordinary meaning of "seating surface(s)" |
| "distal edges joined at a bottom surface apex" | "edges of the seating surfaces situated farthest away from their respective back rests joined to each other at the area of a high point of the bottom surface of the body between the seating surfaces" |
| "wale" | Self-defining |

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes

waiver of the right to review by the district judge and the right to appeal the Court's decision.

See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v.

Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan          
PATRICIA A. SULLIVAN
United States Magistrate Judge
September 23, 2019