**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

SUMMER INFANT (USA), INC.,

    *Plaintiff,*

        -against-

TOMY INTERNATIONAL, INC.,

    *Defendant.*

C.A. No. 17-cv-549-MSM-PAS

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF SUMMER INFANT (USA), INC.'S MOTION IN LIMINE TO PRECLUDE DEFENDANT'S EXPERT WITNESS, CHARLES MAURO, FROM TESTIFYING**

**INTRODUCTION**

TOMY International, Inc. ("TOMY") asserted that Summer Infant (USA), Inc. ("Summer Infant") infringed its patent on a bathtub for infants and toddlers over three years ago. Since that time, TOMY has never offered a comprehensive analysis showing that the Accused Product, Summer Infant's "Comfy Clean Deluxe" bathtub, possessed each and every element of a single claim of its asserted patent. From the beginning, TOMY asserted patent infringement using claim charts that simply omitted any reference to particular claim language and, when called upon to expound on its theories, TOMY offered varying and inconsistent analyses of the Accused Product. The upshot of its assertions is that no matter what the words of the patent mean, and no matter how the details of the Summer Infant tub differ from those words, TOMY insists that Summer Infant's tub is infringing.

This motion addresses TOMY's latest throw-it-against-the-wall-and-see-if-it-sticks effort to press its claim of patent infringement, its engagement of an industrial design expert to testify,

3

essentially, that infringement is so "obvious" that one need not actually analyze the claims of the patent or the product that, he says, infringes that patent. In his written report, Mr. Mauro utterly failed to wrestle with the actual structure of the Accused Product. When that was demonstrated at his deposition, the witness synthesized—seemingly on the fly—a completely new, undisclosed analysis of the patent, and how it might apply to the Summer Infant tub, that has literally zero predicate in the written report, based upon "human factors engineering" considerations such as the developmental stage of the spine of the child placed in the tub. Worse, that analysis, as well as other opinions proffered for the first time at his deposition, are devoid of any external support and amount to nothing more than the say-so of Mr. Mauro himself. Mr. Mauro even undertook to opine on Summer Infant's contractual relationship with Wal-Mart—arguing that Summer Infant couldn't have actually developed an acceptable non-infringing alternative to the Accused Product quickly, despite the fact that Summer Infant actually did so—based upon undisclosed contractual documents to which Summer Infant is not a party and that actually post-dated this entire dispute. That testimony was not only previously undisclosed, it was a complete fabrication.

Try as he might, Mr. Mauro cannot fit the square peg of TOMY's patent—an angular, linear invention—into the round hole of Summer Infant's tub—a fluid design without a single flat surface or straight line. His opinions, as expressed at his deposition, are either completely undisclosed or so heavily revised as to be essentially undisclosed in his report. His conclusions rest on his own say-so or on documents that are completely irrelevant to this dispute. His testimony is unreliable and incapable of being of legitimate assistance to a jury in this case. As a result, Mr. Mauro's testimony should be excluded from trial in its entirety.

## FACTUAL BACKGROUND

This dispute concerns a patent for a tub for bathing infants and toddlers.  The patent at issue, U.S. Pat. No. 6,578,209 (the "'209 patent") (Techentin Decl. Ex. 1)[1], relates to tubs configured to bathe children in both a reclined and a seated position.  The patented invention is a physical object, with no moving parts, electronic components, or unique chemical compounds.  The claims of the '209 patent consist exclusively of descriptions of the physical form of the claimed tub, from the fact that the tub is to be composed of a "molded plastic body" to the fact that it has walls, a rim, seating surfaces, backrests, and a tray for holding clean water or shampoo.  The '209 patent is not a complex patent.  Understanding its terms does not require higher level math, such as calculus or advanced calculus.  *See* Mauro Dep. (Techentin Decl. Ex. 2) at 78:11-14 (noting that the '209 patent is not a complex patent); *id.* at 79:1-7 (understanding the '209 patent "absolutely" does not require a background in calculus or advanced calculus).

The words used in the '209 patent to describe the physical invention are basic terms, including elementary geometric concepts.  Walls extend at differing "incline angles with respect to the rim."  Those wall form back rests for children seated in the tub.  The seating surfaces (there are two) are disposed at "differing inclinations" and extend from the back rests to an "apex," where the seating surfaces are joined.  TOMY has not suggested that the terms "angle," "incline," "differing inclinations," "horizontal," "first," "second," or "extending" are ambiguous or capable of multiple meanings such that they would need to be construed by the Court; therefore, they should be afforded their ordinary and accustomed meaning.  *Renishaw PLC v.*

---

[1] The supporting exhibits to this motion are attached to the Declaration of Jeffrey K. Techentin In Support of Plaintiff Summer Infant (USA), Inc.'s Motion *In Limine* to Preclude Defendant's Expert Witness, Charles Mauro, From Testifying, submitted concurrently herewith ("Techentin Decl.").

*Marposs Societa Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *see also Eon Corp. IP Holdings LLC v. Silver Spring Network, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (acknowledging that the claim construction process begins "with the principle that claims terms are generally given their ordinary and customary meaning" and noting that courts must construe them where there is a dispute over the meaning of terms).

As depicted in the patent, these walls, seating surfaces, and backrests are formed by straight lines. The fact that the tub has linear components is essential to meet the claims language, which requires that they be positioned at "angles" that are different from other "angles" in the tub. Figure 13 of the '209 patent shows the differing angles for the two backrests (here, circled in blue) as $\alpha_1$ and $\alpha_2$, and the differing angles for the two seating surfaces (here, in square red rectangles), as $\beta_1$ and Reference No. 70[2]:



The fact that these surfaces are linear is explicit in the patent. First, the drawing above references each of $\alpha_1$ and $\alpha_2$ as the angles formed by the two backrests and $\beta_1$ as the angle formed

---

[2] Reference No. 70 indicates a "generally horizontal seating surface." '209 patent at Col. 5, line 54. The fact that the surface is "horizontal" results in there being no "angle" between the seating surface and the horizontal plane, which is indicated by the two lines emanating from the outermost portions of the bottom of the tub. Therefore no second angle (which would, presumably, be labeled $\beta_2$) is shown. It also follows that because it is "horizontal," that seating surface is, like the other seating surface and the back rests, linear.

between the infant-side seating rest and the horizontal plane.  The patent does not explain why the text does not use the same symbols, but those same references are included in the text as "É₁," "É₂," and "é₁" respectively.  That these two sets of symbols refer to the same angles is clear in the specification:

> As shown, two seating surfaces are disposed at one end of the tub (the left end, as shown), an inclined Surface **62** extends generally ***at the angle É of about 41 degrees*** and Serves as a back rest for a reclining infant (see also FIG. 1). At the lower end of surface **62**, a tub bottom surface **64** extends upward generally ***at an angle é of about 45 degrees*** and forms a seating surface associated with back rest **62**, with apex **66** received behind the knees of the infant. At the other end of the tub (the right end, as shown), an opposing back rest **68** extends generally ***at the angle É of about 77.5 degrees*** and serve as a back rest for a toddle [*sic*] seated on generally horizontal Seating Surface **70** (see also FIG. 2).

'209 patent at Col. 5, Lines 42-55 (bold for reference numerals in original, other emphasis supplied).  That is, "α₁" and "É₁" each refer to the angle formed by the infant-side backrest and the horizontal plane, "α₂" and "É₂" each refer to the angle formed by the toddler-side backrest and the horizontal plane, and "β₁" and "é₁" each refer to the angle formed by the infant-side seating surface and the horizontal plane.

Elsewhere, the '209 patent describes the tub's "side walls, […] as well as most other surfaces that extend generally perpendicular to the horizontal resting plane of the rub [*sic*], are molded at a draft angle τ, with respect to vertical, of about five degrees" '209 patent Col. 5, Lines 56-59.  Once again, just as with the seating surfaces and back rests, the drawings make it clear that these surfaces are linear and capable of forming an angle, this time with respect to the vertical plane:



FIG. 14

Lest there be any ambiguity on the point, in Figure 14, just as in Figure 13, above, the draftsman has helpfully provided a reference line for the vertical plane as well as an extension line from the side wall to demonstrate the angle τ.

The fact that the '209 patent describes each of these relationships as "angles" establishes that the surfaces are linear, at least in cross-section.[3]  "Angle" is a well understood term. Common use English dictionaries define it as, for example, "the figure formed by two lines extending from the same point."  *Angle*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/angle (last accessed 2/21/2021).  More technical references, such as the McGraw-Hill *Dictionary of Mathematics* define "angle" as, for example,

---

[3] Figure 13 shows a cross section of the tub where the tub has been bisected length-wise.  Other aspects of the drawings and the specification suggest that the seating surfaces and back rests are, or may be, curved horizontally (that is, from one side of the tub to the other).  *E.g.*, '209 patent Col. 5, Lines 64-66 (apex follows a radius "similar to the curvature of the infant seating surface").  The result is that those surfaces are not planar, because they are curved in one dimension. They are, however, composed of a series of parallel lines that have the same angle of inclination with respect to horizontal.

To illustrate this concept, one could take a sheet of paper on a desk, hold it by the sides, and lift the sides upwards.  Lengthwise, the paper is straight, but horizontally it is curved.  Lifting one end of the paper while leaving the other in contact with the desk would create an angle between the desk (horizontal) and the paper, and that angle will be the same regardless of where it is measured on the surface of the paper.

"[t]he geometric figure, arithmetic quantity, or algebraic signed quantity determined by two rays emanating from a common point or by two planes emanating from a common line."  Mark D. Licker, *McGraw-Hill Dictionary of Mathematics* 8 (2d ed. 2003).  In the patent context, courts have not departed from this basic notion of two lines that meet at a point.  The District of Minnesota, for example, found that an "angle" is "defined by two rays emanating from a common point [...]."  *Floe Int'l, Inc. v. Newmans' Mfg. Inc.*, Civil No. 04-5120 (DWF/RLE), 2006 U.S. Dist. LEXIS 42114 (D. Minn. June 21, 2016) (rejecting proposed definition of "angle" as "slope").  TOMY's infringement expert believed that the word "angle" was so elementary as to define itself, stating: "An angle is an angle. ***It's two lines at an angle.*** It's nothing more than that."  Mauro Dep. at 112:5-8 (emphasis added). Techentin Decl. Ex. 2.

As a matter of basic English usage, therefore, the '209 patent is limited to tubs that have two backrests and two seating surfaces, each of which forms an angle with respect to the horizontal plane (except for the toddler side seating surface, which rests on the horizontal plane itself).  Nothing in the patent, its specification, or its file history erases this essential feature of the patented invention.

## A. TOMY's History of Scattershot Theories of Infringement

To understand where this witness's testimony fits into TOMY's infringement contentions, and why he has resorted to tortured and unnatural arguments about the '209 patent and the Accused Product, some background is necessary.

An example of TOMY's opportunistic application of the patent can be found in its assertions regarding what constitutes "seating surfaces" in the Accused Product.  As a result of earlier proceedings, in particular the claim construction determinations, the Court is familiar with much of the patent's claim language.  As the Court will recall, and as is explained below, the

structure claimed in the asserted patent not only includes "seating surfaces" *per se*, but seating surfaces that have specific relationships to one another and to other features of the tub.  As a result, it is of critical significance in any infringement analysis what, precisely, might be described as a "seating surface" in the Accused Product because, without that determination, it is impossible even to consider whether those surfaces meet the required elements of the patent, most notably whether the "seating surfaces" are "disposed at differing inclinations" and have "distal edges" that are "joined at a bottom surface apex."  *See* '209 Patent at Col. 6, Lines 28-51 (Claim 1) and Col. 8, Line 51 to Col. 10, Line 6 (Claim 30).[4]

In its relentless attempts to press a claim of infringement where there is none, TOMY asserted at least four different, mutually-exclusive positions regarding what the "seating surfaces" are in the Summer Infant tub.  That is, TOMY asserted radically different interpretations of the patent, as applied to the Accused Product, (1) in its initial demand that Summer Infant cease and desist from selling the Accused Product, (2) in its rebuttal to Summer Infant's response to the cease and desist letter, (3) in its sworn responses to Summer Infant's interrogatories, and (4) in its (again, sworn) 30(b)(6) testimony:

| **Initial Cease and Desist (11/14/17)** **(Techentin Decl. Ex. 3)** |  |

---

[4] Claims 1 and 30 are the only independent claims to be asserted against Summer Infant.  If TOMY cannot establish that all of the elements of either of those claims are present in the Accused Product, its infringement contentions for the remaining dependent claims fail.

| | |
|---|---|
| **Second Letter to Summer Infant (11/29/17)**<br><br>**(Techentin Decl. Ex. 4)** |  |
| **Interrogatory Responses (11/26/18)**<br><br>**(Techentin Decl. Ex. 5)** | |
| **30(b)(6) Deposition (4//23/19)**<br><br>**(Techentin Decl. Ex. 6)** | |



Summer Infant detailed these inconsistencies in correspondence to TOMY's attorney on June 26, 2019 (Techentin Decl. Ex. 7), but TOMY opted not to clarify or explain.  In fact, TOMY simply ignored the letter.

TOMY's sworn testimony pursuant to Rule 30(b)(6) presents a significant problem for TOMY, because, in light of this court's claim construction ruling, ***TOMY's testimony amounts to an admission that there is no infringement***.  TOMY's designee, who made the markings on the Accused Product depicted above, testified that the generally-oval-shaped area marked "A" is one of the seating surfaces, the area marked "B" is another of the seating surfaces, and areas "C" and "D" indicate the "distal edges" of the seating surfaces, *i.e.*, the edges that are farthest away from their respective back rests.  TOMY drew the portion marked "E" to denote the "bottom surface apex."  R. Voss Dep. (6/18/19) (Techentin Decl. Ex. 8) at 170-182.[5]  When challenged as

---

[5] Contrary to the positions it set forth during claim construction, TOMY noted that "Technically the apex would probably mean the pinnacle or the point," but then drew what the witness called a "blob" around that pinnacle, which he identified as the bottom surface apex.   R. Voss Dep. at 178:15-22.  Techentin Decl. Ex. 8.  That "blob"-shaped area, which is "in the area of a high point

to how these seating surfaces could be said to be "joined at" the bottom surface apex given that the two seating surfaces never actually meet, the witness reversed himself and asserted that the entire protrusion (which he then circled with a dotted line) should be considered the apex "because I believe it connects itself." *Id.* at 179:4-180:2.  Asked whether TOMY considers those two edges to be "joined," TOMY asserted: "They are joined *by the apex*.  In essence it joins them." *Id.* at 180:15-22 (emphasis added).

During claim construction, TOMY argued that the patent should be interpreted in a manner that would enable those contentions to be consistent with a finding of infringement. However, TOMY's contentions—that the entire central "hump" of the Accused Product could be an "apex" and that the patent claims only require that the edges of the seating surfaces be joined "by" some intervening structure—were heard and rejected by this Court during claim construction.  The Court has construed "joined at" to mean "joined at" (and not "joined by" some other structure) and "bottom surface apex" to mean "the area of a high point of the bottom surface of the body between the seating surfaces."  Dkt. 68 at 2 (adopting Report and Recommendation); *see also* Dkt. 54 (Report and Recommendation regarding claim construction) at 18, 21 ("mindful of the lack of words or drawings that alter the plain meaning of "joined at," coupled with prosecution history making clear that the term means that the edges "meet," I reject TOMY's construction that 'joined at' contemplates the introduction of a third intervening structure between the two seating surfaces.").[6]  To be joined "at" an apex, even if that apex is not

_____

of the bottom surface" arguably matches the Court's construction of the term "apex" ("the area of a high point").

[6] TOMY's earlier assertions as to what constitute "seating surfaces" in the Accused Product likewise cannot support a finding of infringement given the Court's claim construction because each of them, like the 30(b)(6) testimony, admits that the seating surfaces on the Summer Infant tub are not "joined at" any point or area, but instead are "joined by" an intervening structure.  In

a single point, it simply must be the case that the joint is at some elevated position. As Magistrate Judge Sullivan put it, "it is clear that 'apex' must be construed to mean *a surface that is higher than other portions of the tub's bottom surface*, located between the seating surfaces." *Id.* at 18 (emphasis added). To call a component that includes a portion at the very bottom of the bottom surface an "apex" defies logic and this Court's claim construction ruling.

As a result, TOMY's allegations of infringement cannot carry the day: by its own reckoning, the "seating surfaces" of the Summer Infant tub are not "joined at" any location, they are "joined by" the central "hump." The Court has also foreclosed TOMY's backup argument, that because the two surfaces each are joined to the "hump," one should consider the entire "hump" to be the "bottom surface apex," with the result that the edges are joined "at" the "apex." This cannot be, however, because TOMY's sworn deposition testimony is that the "distal edge" of the toddler-side seating surface is on the lowest portion of the bottom of the tub. It is simply impossible for it to be joined to anything "at the area of a high point" because it is *not adjacent to an area of a high point*:



**B. TOMY's Expert**

the interest of verbal economy, Summer Infant will not recount the analysis for each of those scenarios.

Having *de facto* conceded the question of infringement in its own sworn testimony, TOMY has now hired a purported expert, Charles Mauro, to carry the banner of its infringement contentions.  Mr. Mauro has set forth his analysis and conclusions in a report.  Techentin Decl. Ex. 9.  Without explanation or acknowledgement, Mr. Mauro rejected ***all four*** of TOMY's previous contentions regarding what is a "seating surface" in the Accused Product, and came up with a new theory as to what comprises the "seating surfaces" of the Summer Infant tub, shown below:



As can be seen, Mr. Mauro's conclusions require that the seating surface for a toddler includes an upwardly-sloping portion of the protrusion in the middle of the tub.  Likewise, his analysis requires that the entirety of the infant-side seating surface consists of the generally vertical other side of the protrusion.  His report offers no analysis as to why one might think that an infant would "sit on" that portion of the tub, but not on the substantially horizontal portion—a conclusion that defies any commonsense notion of how a baby fits in the tub.

Mr. Mauro's creative definitions of "seating surfaces" might overcome one of the fatal flaws of TOMY's earlier contentions:  by including the upward-sloping portion of the hump as

"seating surface," he can contend that the edges of those surfaces meet "at" the bottom surface apex.

Mr. Mauro's report, which contains 21 pages of text and 28 pages of claims charts, concludes that the Summer Infant tub infringes several claims of the '209 patent.  He also opines that "at the time of infringement, there were no available, acceptable non-infringing alternatives to the patented tub," a subject that he identifies as being necessary to TOMY's claim for lost profits damages.  *See* Mauro Report at 17, 21.

## ARGUMENT

Mr. Mauro should not be permitted to testify at trial because his opinions are inherently unreliable, his methodology was deeply flawed, and his analysis is completely undisclosed in his expert report.

### 1.  Applicable Legal Standards

#### a.   An Expert's Undisclosed Analysis and Conclusions Must be Precluded

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires the disclosure of an expert's opinions in the form of a written report.  The rule requires that the report provide the following information:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Such disclosure is mandatory.  *Id.*, *see also Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011) ("A party seeking to introduce expert testimony at trial must disclose to the opposing party a written report that [contains the information required by Rule 26(a)(2)(B)].").  The rule serves to "prevent the unfair tactical advantage that can be gained by failing to unveil an expert in a timely fashion" and "to facilitate a fair contest with the basic issues and facts disclosed to the fullest practical extent."  *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004).

Excluding evidence that is not properly disclosed under Rule 26 is within the discretion of the trial court, and the "baseline sanction for failure to comply with Rule 26 is preclusion." *Gay*, 660 F.3d at 62.  Where a witness's testimony is a "departure from the general scheme of the expert's report," precluding that testimony is warranted.  *Licciardi v. TIG Ins. Group*, 140 F.3d 357, 366 (1st Cir. 1998).

      b.  <u>Legal Standard For Admissibility Of Expert Testimony</u>

Expert testimony that is properly disclosed under Rule 26 must still meet the requirements of Rule 702 of the Federal Rules of Evidence in order to be admissible.  Rule 702 states as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To be admissible, the subject of expert testimony must be "scientific, technical or other specialized knowledge" and it must "assist the trier of fact" such that it is reliable, relevant and helpful to the case at hand.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *ADP Marshall, Inc. v. Noresco, LLC*, 710 F. Supp. 2d 197, 225-26 (D.R.I. 2010)

(precluding expert testimony because it was not relevant or helpful, but merely confirmed certain facts in the case) (citing *Bogosian v. Mercedez-Benz of North America, Inc.*, 104 F. 3d 472, 476 (1st Cir. 1997). Whether expert testimony "assist[s] the trier of fact" is based on "the reliability and helpfulness of the proposed expert testimony, the importance and the quality of the eyewitness evidence it addresses, and any threat of confusion, misleading the jury, or unnecessary delay." *United States v. Rodriguez-Berrios*, 573 F.3d 55, 71 (1st Cir. 2009) (quoting *United States v. Brien*, 59 F. 3d 274, 277 (1st Cir. 1995)).

Expert testimony also "assist[s] the trier of fact" when it relates to obscure matters beyond the knowledge of most people, when it deals with complex matters that challenge the comprehension of lay people, or when the subject matter is simply confusing. *See* 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Federal Rules of Evidence Rules 614 to 706*, § 6264, at 212-13 (1997); *see also United States v. Winkle*, 477 F.3d 407, 415 (6th Cir. 2007) (allowing expert to testify because case was complex); *United States v. Tapia-Ortiz*, 23 F.3d 738, 740 (2d Cir. 1994) (holding expert testimony "should normally be used only for subjects that have esoteric aspects reasonably perceived as beyond the ken of the jury"); *United States v. Theodoropoulos*, 866 F.2d 587, 592 (3d Cir. 1989) (allowing expert to testify because issues in question were complex and there was confusion created by such issues); *Board of Educ., Yonkers City School Dist. v. CAN Ins. Co.*, 113 F.R.D. 654, 655 (S.D.N.Y. 1987) ("[I]t is the very purpose of expert testimony to assist the trier of the facts to understand, evaluate and decide the complex evidential materials in a case."). Expert testimony might also be appropriate if there is no other evidence concerning the issue in question. *See Wright & Gold*, *supra*, at 214.

In contrast, expert testimony does not assist the trier of fact "where there are other means to put the jury in a position to accurately decide the facts." *Id.* at 214-15. Expert testimony also

does not "assist the trier of fact" when it is speculative or ambiguous.  *See Hartford Ins. Co. v. GE*, 526 F. Supp. 2d 250, 259-60 (D.R.I. 2007) (precluding testimony by purported expert because it was "no more than unsupported speculation, and is thus inadmissible"); *see also United States v. Frazier*, 387 F.3d 1244, 1266 (11th Cir. 2004) (excluding expert whose imprecise and unspecific expert opinion "easily could serve to confuse the jury and might well" mislead it).  Moreover, the "helpfulness" standard under Rule 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92.

Even if the subject matter of the proposed expert testimony initially satisfies the admissibility standard, the proposed witness must also be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  In addition, the proposed expert's methodology must be valid and capable of being reliably applied to the facts.  *See Daubert*, 509 U.S. at 594-95.  Factors that courts consider when qualifying an expert include the following: (1) whether the proposed expert's methodology can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) general acceptance within the scientific community.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 594-95.

For a proposed expert to have sufficient and reliable specialized knowledge that would assist the trier of fact, that purported expert must possess and be able to present "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  Indeed, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may

conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Hartford Ins. Co.*, 526 F. Supp. 2d at 259 (quoting *Ruiz-Trouche v. Pepsi-Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Therefore, a proposed expert's opinion lacks a reliable foundation if it is based solely on his own experience and thus such testimony should be excluded. *Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999) (excluding witness as expert on industry standards because his own subjective experience did not constitute sufficient knowledge that would assist trier of fact) (citing *Daubert*, 509 U.S. 590); *see also U.S. Fidelity & Guar. Co. v. Sulco, Inc.*, 171 F.R.D. 305, 308 (D. Kan. 1997) (holding for *Daubert* to apply, proffered expert must rely on some principle or methodology, and "is unwarranted if expert testimony is based solely on experience or training"). *Cf. Frazier*, 387 F.3d at 1266 (when purported expert relies "solely or primarily on experience, then the witness must explain ***how*** that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. . . . An expert's qualification and experience alone are not sufficient to render his opinions reliable" (emphasis in original)); *see also U.S. v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (same); *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413, 417 (W.D.N.Y. 2005) (excluding expert because failed to explain why his training and experience led him to his conclusion).

For the reasons set forth herein, Mr. Mauro's testimony in inadmissible in light of the foregoing standards.

Pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), district courts "act as gatekeepers, ensuring that an expert's proffered testimony both rests on a reliable foundation and is relevant to the task at

hand." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012); *Esposito v. Home Depot U.S.A., Inc.*, No. 06-153 S, 2010 U.S. Dist. LEXIS 132406, at *2 (D.R.I. Dec. 14, 2010).  In acting as gatekeeper, the Court must determine "whether the [expert] testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at *3 (quoting *Kumho Tire*, 526 U.S. at 141).  An otherwise qualified expert witness may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)-(d).

In its performance of its relevancy determination, the Court must resolve whether the expert testimony, if admitted, would likely assist the trier of fact to understand or determine a fact in issue.  *Diaz*, 300 F.3d at 73 (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1988)).  A Court may exclude expert testimony "'where it finds that the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence.'"  *Riani v. Louisville Ladder, Inc.*, No. 07-40258-FDS, 2010 WL 2802040, at *6 (D. Mass. July 14, 2010) (quoting *Casas Office Machs. Inc. v. MITA Copystar Am*, 42 F.3d 668, 681 (1st Cir. 1994) (citing *Quinones-Pacheco v. Am. Airlines, Inc.*, 979 F.2d 1, 7-8 (1st Cir. 1992)); *see also MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-cv-1096-SEB-TAB, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009).  Experts, no matter how qualified on paper, are not

permitted to testify as to conclusions that have no basis in fact or that are entirely disconnected from the matters set forth in their expert reports.

**2. Mr. Mauro's Analysis Changed Radically from his Expert Report to His Deposition**

      a.  <u>Mr. Mauro's Expert Report</u>

In 2019, two years after TOMY first asserted patent infringement against Summer Infant, TOMY hired Mr. Mauro to serve as its infringement expert in this matter. On July 29, 2020, Mr. Mauro issued his expert report, which, per Fed. R. Civ. P. 26(a)(2)(B), was required to set forth "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as the "facts or data considered by the witness in forming them."

Mr. Mauro's report analyzed the Accused Product and concluded that it infringes on the '209 patent. In doing so, Mr. Mauro provided a "claims chart" that purported to recite his analysis of the patent claims and why, in his opinion, each of the elements of the asserted claims was present in the Accused Product. Mr. Mauro's analysis was simple and without any significant nuance: In addition to a barebones "analysis" paragraph in which he stated his conclusions as to how the Accused Product read on the claim language, he also included photographs to show the Accused Product, with verbal annotations and arrows to indicate where, in his opinion, that limitation was to be found, such as that shown immediately below for Claim 1:



Notably, however, Mr. Mauro's claims chart does not reveal, at all, whether he reached any conclusion as to the presence of certain claims limitations in the Accused Product and, in certain instances in which he did express a belief that the limitation was present, how he came to that conclusion.

Mr. Mauro's treatment of Claim 1, for example, properly recites that the claim requires two "opposing side walls," each of which must "extend" at an "incline angle with respect to the rim," and which must be different one from the other. Mr. Mauro's actual analysis, however, simply papers over those requirements, stating that the side walls are "inclined relative to the upper rim" and that the right side wall is "at a different incline than the left side wall." Mr. Mauro offers no conclusion that either of the opposing side walls forms an "incline ***angle***" with respect to the rim as is actually required by the patent claim, let alone what those angles might be so that one could understand that they are different.

Mr. Mauro conceded at his deposition that he performed no analysis to determine what, if any, "incline angle with respect to the rim" either of the side walls of the Accused Products might have. He simply eyeballed it.

This is not an insignificant oversight, because what Mr. Mauro either failed to perceive, or simply ignored, was that both the "rim" of the Accused Product and the backrests for the two seating positions in the Accused Product are complex curved surfaces, as can be seen in the following illustration, taken from the expert report of Summer Infant's expert, Mr. Joseph Gordon:



The rim of the Accused Product can clearly be seen to curve, with a significant dip in the middle of the tub.  On closer inspection, it is also apparent that the backrests themselves are curved. While that curvature is less readily displayed in a small photograph such as those used by Mr. Mauro, it is apparent to anyone who examines a physical specimen of the Accused Tub.  For purposes of this brief, Summer Infant would submit the following illustration, created by Mr. Gordon, which applied a virtual "texture" to the CAD drawing of the Accused Tub to highlight the curvature of the various elements of the Accused Product:[7]

---

[7] Summer Infant respectfully submits that the better means for the Court to perceive this curvature is to inspect a physical exemplar of the Accused Product, which Summer Infant intends to submit to the Court consistent with its current operating procedures.



As a result, neither of the "side walls" defines a line that intersects with a line defined by the "rim."  There is no "angle of inclination with respect to the rim."

At deposition, Mr. Mauro conceded that the Summer Infant tub is a "complex shape" and that both its seating surfaces and its backrests are "curved in both dimensions."  Mauro Dep. at 159:5-23.  Techentin Decl. Ex. 2.  In his written report, however, he performed no analysis of how these complex curves could be analyzed in terms of "angles" or "inclination."

> b.  <u>Mr. Mauro's Reimagining of the Patent During His Deposition</u>

Mr. Mauro is a well-educated, experienced expert witness.  Confronted with the fact that the patent called out the patented tub as having surfaces that formed "angles" and that "extended" at various "inclinations," and an Accused Product that did not, Mr. Mauro simply revised the language of the patent to cover the Accused Product.  Pronouncing a new and previously undisclosed interpretation of the patent based exclusively on his own say-so as an expert (or, as he referred to himself no fewer than 50 times during his deposition, "one of ordinary skill in the art"), Mr. Mauro decreed that the patent actually disclosed a tub with complex curvature, just like the Summer Infant tub.  Mr. Mauro testified:

> Q.     Mr. Mauro, is it possible with your training and experience
>        as an industrial engineer and a human factors engineer -- industrial

25

designer and human factors engineer to determine the incline angle of a curved surface, curved in two different directions with respect to another surface that is curved in two different directions?

THE WITNESS: Is it technically possible, is that your question?

MR. TECHENTIN: Yes.

A. Sure. Look at the CAD file.[8] You can do that. But I just want to, since we're back on this, what's important is one of the ordinary skill in the art that's designing infant seating would look at a claim that says the inclination or angle of the backrest, for example, and they would know that that backrest is curved. One of ordinary skill is not going to confuse this straight line thing with the curve. One of ordinary skill automatically understands when you see an inclination even as a discrete angle, let's say 87 degrees, something like that, that that seat back is actually curved in two dimensions.

Now, could you look at the CAD file and look at the three-dimensional mesh that's used to create three-dimensional shade in the backrest in CAD, you can measure it at any point on that three-dimensional surface, how many directions you want, what is a discrete angle, if you want, with reference to the world or some other reference point.

***But what's really important is that one of ordinary skill in the art when they read inclination, they understand curve, that's the way they read that specification.***

Q.      And is that shown anywhere in the patent?

---

[8] Mr. Mauro did not, in fact, look at a CAD file to determine the incline angles in the Accused Products because, he testified "the patent claims are written in such a way that one of ordinary skill in the art is ***going to look at this product and understand what they meant***." Mauro Dep. at 163:24-164:4. Techentin Decl. Ex. 2. This is an incorrect analysis as a matter of law. An infringement analysis must compare the Accused Product to the patented design, not to a commercial embodiment. *See Payless Shoesource, Inc. v. Reebok Int'l, Ltd.*, 998 F.2d 985, 990 (Fed. Cir. 1993); *see also High Point Design LLC v. Buyer's Direct, Inc.*, 621 F. App'x 632, 642 (Fed. Cir. 2015) ("We have long-cautioned that it is generally improper to determine infringement by comparing an Accused Product with the patentee's purported commercial embodiment." (citing *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1196 (Fed. Cir. 1995), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 672-79 (Fed. Cir. 2008) (en banc)). Mr. Mauro seems to have taken this mistake (referencing the patentee's product rather than the patent) a step further, suggesting that the ***Accused Product*** can inform an expert's understanding of the claims. Such bogus analysis, of course, would virtually always ensure that the expert would find infringement, as happened here.

> A.      ***Well, no, because the patent is properly written.*** It describes, you know, two incline surfaces which are essentially backrests. ***When a designer, industrial designer, human factors engineer reads those requirements, they know there is an incline seat here and incline seat here and those incline seats are the curve.***

Mauro Dep. at 161:10-163:3 (emphasis added).  Techentin Decl. Ex. 2.  Stripped to its essence, Mr. Mauro is saying that a "properly written" patent should be construed to mean the opposite of what it says, not because "one of ordinary skill in the art" has a secret decoder ring that translates words like "angle" to some other not-angular terms, but because the expert believes that the disclosed design isn't a good design.

Mr. Mauro repeatedly asserted that his interpretation of the patent is correct because he, as a designer, believes that the patent's characteristics should be interpreted in accord with his own beliefs about what a properly designed product should look like.  Mr. Mauro, utterly without foundation either in his expert report or the patent, simply imagines new characteristics of the patented tub:

> So what we're talking about here is a product highly optimized to minimize the stress on infants and toddlers, and these types of seats have to be articulated, curved in such a way that they grasp the toddler, they support the toddler and infant, and they are also comfortable because you don't want unnecessary stimuli causing the infant to move and -- infant support is actually relatively complex. So, you could have a chair, straight angles, but that would be more an object of art than it would be an object of commerce designed for comfort and functionality.

Mauro Dep. at 155:23-156:10.  Mr. Mauro's effort to recast the patented design into a concept that would embrace the curved, sophisticated shape of Summer Infant's tub causes him to reject the actual patent language:

> ***If you were in isolation, and you have no idea what these design problems are all about, the design seat for a toddler and an infant, support system, then you might have the tendency to read that, oh, it's a straight line, it's an inclination.*** But that's not the

> measure. **The measure of infringement is how does one of**
> **ordinary skill in the art interpret that claim.** One of ordinary skill
> in the art is going to know that that claim term, which is a line of
> inclination, I've forgotten exactly how it's written. The implication
> on your side is it's a straight line. That's not the correct view from
> the standpoint of one of ordinary skill in the art. Inclination on the
> backrest of one of ordinary skill in the art automatically
> understands that that means a back surface you know, three-
> dimensional curved shape.

Mauro Dep. at 164:5-22.

Mr. Mauro, claiming in essence that a product infringes if he says it does, overstates his

role as a "person of ordinary skill in the art."  Assuming he meets that threshold requirement, his

testimony might be informative as to the meaning of **claim terms**, not the overall scope of the

claims themselves.  *See e.g.*, *Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1358 (Fed. Cir.

2017) ("'Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary

artisan after reading the entire patent.'") (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321

(Fed. Cir. 2005) (en banc)).  Here, Mr. Mauro is attempting to side-step that distinction.  He is

not testifying that any of the terms actually used have a meaning apparent to skilled artisans by,

for example, saying that "angle" actually should be interpreted as something other than "angle."

Rather, he is suggesting that, taken as a whole, the plain language of the patent would yield a

suboptimal design, and that complex curvature for the backrests and seats would be preferable to

linear forms so that must be what the inventor had in mind.  By his own admission, Mr. Mauro's

assertion that the claims specify curved walls and seating surfaces is not based on the language

of the patent, but on his own "expertise."

That is not the law.  An "expert is a conduit of facts and not merely a subjective

speculator relying on stature alone." *Grimes v. Hoffmann–LaRoche, Inc.*, 907 F. Supp. 33, 35

(D.N.H. 1995).  "It is well-settled that, in interpreting an asserted claim, the court should look

first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the

specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Extrinsic evidence such as expert testimony is certainly not dispositive of claims language; in fact, while it is ***permissible*** to consider such evidence, it is "generally of less significance than the intrinsic record." *Phillips*, 415 F.3d at 1317 (citing *C.R. Bard Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Moreover, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Phillips*, 415 F.3d at 1318 (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Here, the Court is presented with overwhelming, unambiguous, and uncontroverted evidence in the intrinsic record of a tub invention that displays linear relationships and that is inconsistent with a structure composed of complex curved surfaces that are curved in multiple dimensions. First, the claim language recites "incline angles," "differing inclinations," walls that "extend[] generally at an angle of 77 degrees with respect to horizontal with the tub resting upright on a horizontal surface," and so on. Next, the specification includes drawings and descriptions that include such explicit references to linearity and angularity as the following:

> As shown, two seating surfaces are disposed at one end of the tub (the left end, as shown), an inclined Surface **62** extends generally ***at the angle É of about 41 degrees*** and Serves as a back rest for a reclining infant (see also FIG. 1). At the lower end of surface **62**, a tub bottom surface **64** extends upward generally ***at an angle é of about 45 degrees*** and forms a seating surface associated with back rest **62**, with apex **66** received behind the knees of the infant. At the other end of the tub (the right end, as shown), an opposing back rest **68** extends generally ***at the angle É of about 77.5 degrees*** and serve as a back rest for a toddle [*sic*] seated on generally horizontal Seating Surface **70** (see also FIG. 2).

'209 patent at Col. 5, Lines 42-55 (bold for reference numerals in original, other emphasis

supplied).  The drawings themselves, also a part of the intrinsic record, call out the specific

angles formed by the straight lines of the claimed tub:



Neither the patent nor the specification contains any suggestion to the contrary.  As to the

remaining piece of intrinsic evidence, the patent's file history, there is no reference in that

document to support any suggestion that the inventor had in mind a curved surface and not the

linear surface depicted, described, and claimed.  (The file history has previously been submitted

to the Court as Exhibit 4 to TOMY's claim construction brief (Dkt. 35-4)).

### 3.  Mauro's Analysis Fails to Account for the Curved Surfaces of the Accused Product

Throughout his analysis, Mr. Mauro failed to take into account the fact that the seating

surfaces, back rests, and rim of the Accused Product—like all of the surfaces in the Accused

Product—are curved, and curved in complex ways that absolutely preclude them from "reading

on" the claims of TOMY's patent.  Both of the asserted independent claims require that the

seating surfaces be "disposed at differing inclinations."  Mr. Mauro simply asserts that to be the

case with the Summer Infant tub.  His entire analysis of this claim element consists of the

following:

- "The seating surface on the right side as shown is of a steep slope. The seating surface on the left includes a relatively horizontal portion and an upwardly curved portion.  The different portions of the left seating surface are sloped differently than the right side seating surface."  (Mauro Report at 47 ("Analysis 1" for Claim 1)

- "The left seating surface is of a different slope than the right side of the seating surface."  (Mauro Report at 48 ("Analysis 2" for Claim 1))

- "The left seating surface is of a different slope than the right side of the seating surface."  (Mauro Report at 61 (Analysis of Claim 30))

Mr. Mauro replaces the claims language ("disposed at differing inclinations") with different language ("slope"), but in either event his use of those terms is mathematically and geometrically incorrect.  "Inclinations" and "slopes," as well as "angles" are descriptions of *linear* relationships.  An "angle" is a "geometric figure, arithmetic quantity, or algebraic signed quantity determined by two rays emanating from a common point or by two planes emanating from a common line."  Mark D. Licker, *McGraw-Hill Dictionary of Mathematics* 8 (2d ed. 2003).  "Slope" is defined as a "number that measures how steep the line is."  Douglas Downing, Ph.D., *Dictionary of Mathematics Terms* 316 (3d ed. 2009).  The definition proceeds to explain that "A horizontal line has a slope of zero, [and as] a line approaches being a vertical line, its slope approaches infinity."  *Id.*  An "angle of inclination" is defined as "a line with slope $m$ is arctan $m$, which is the angle the line makes with the $x$-axis."  *Id.* at 13.

This raises the question, then, how two curves (a seating surface and a rim, for example) could form an "angle."  At his deposition, counsel for Summer Infant asked Mr. Mauro: whether

31

it is appropriate to "speak of an angle for two curves," and Mr. Mauro responded:  "That sounds, you know, a bit like it's a contradiction."  Mauro Dep. at 113:2-4.  He continued:

> But you could take two curves, one curve here and a curve here, and you could draw a line from the radiant at the top extension of one to the bottom, top to the bottom. And you would get two, what we call in design reference lines. You could do that. ***But a curve is a curve. It's not a line. Don't confuse that.*** A curve has a radius, it has a radius of R, and R determines -- even though it can look almost dead straight.

Mauro Dep. at 113:4-12.  Techentin Decl. Ex. 2.  Mr. Mauro thus knew and appreciated that it is simply incorrect to describe the relationship between two curves as being an "angle."

Given that the Accused Product consists entirely of curved surfaces, counsel for Summer Infant therefore asked Mr. Mauro how he could have actually measured or calculated the inclination of the seating surfaces in light of this inconsistency, Mr. Mauro confirmed that he had never done so, instead having simply looked at the tub and found it to be "obvious" that the inclinations were different.  Pressed for details, he simply regurgitated paragraphs of nonsensical "expert-ese" to *justify never having actually analyzed the Accused Product against the claims of the patent*, as he did in this exchange:

> Q.      So, when you are determining the, quote/unquote, inclination of that seating surface, how do you determine that?
>
> A.      Well, I think that that's a very good question, and that's answered specifically by the process of viewing that claim with respect to one of ordinary skill in the art. They view seating surface inclination as a descriptive term on which they apply the physical, evaluate the physical design. It could be dead flat to articulated.
>
> There are seating surfaces that have, you know, various bumps in them, but when you talk about a seating surface, you don't -- they talk about the angle, what you're really talking about is the composite of the articulation of the surfaces themselves. So it's not like a straight line, it's never a straight line. It's a combination.

> When you talk about inclination, it's really -- it's the general framework of the seating surface, general articulation in three-dimensional space as opposed to a hard reference line. So that's how you would, one of ordinary skill in the art would answer the question related to inclination of a seating surface. It's the 3-dimensional implementation of the word inclination, or slope, or in this case inclination.

Mauro Dep. at 204:23-206:1.  Likewise, when presented with the simple question "What's the incline angle of the infant side sidewall?", Mr. Mauro admitted that he hadn't bothered to figure that out, and then claimed that he didn't need to because, as an expert, he could just perceive that the claim limitations were met:

> Q.  What's the incline angle of the infant side sidewall?
>
> A.  **I haven't measured either one of those**, you know, using a specific numeric term, but from a human factors engineering point of view, which is what drives these angles and drives the curved shape of these claims, you know, elements, **the relative inclination looks right to me** from the standpoint of the resting weight of an infant is roughly in the center of their lower abdomen, and the curvature in the angle, the degree in which it lays back appears correct to me, and if you look at the toddler, the toddler, because they have a much more heavily articulated spine at that point, and they have more muscular robustness, that back looks roughly equivalent to what it should be from human factors engineering point of view. **When I look at these tubs, my background in human factors informs those angles and those surfaces.**

Mauro Dep. at 153:2-21 (emphasis added).  Mr. Mauro's report contains no hint that he believed it was necessary to understand the claims as calling for curved surfaces based upon factors such as "the resting weight of an infant" or the "heavily articulated" spine of a toddler.

After literally hours of such prolix and convoluted answers, Mr. Mauro finally admitted, flat out, that when it came to determining whether the seating surfaces were at "differing inclinations," "I didn't do that analysis.  I don't have an opinion on it."  *Id.* at 261:23-262:10-11.

TOMY's infringement expert, therefore, doesn't have an opinion one way or another whether essential claims limitations can be found in the Accused Product. Because infringement only occurs where each and every limitation of one or more claims is present, *see Signtech U.S.A. v. Vutek, Inc.*, 174 F.3d 1352 (Fed. Cir. 1999), his opinion that the product infringes is, as a matter of law and fact, unfounded. Such testimony is not admissible at trial and should be excluded.

### 4. Mr. Mauro's Disclosed Opinions Regarding Acceptable Noninfringing Alternatives Are Based on a Misunderstanding of the Law and His Other Opinions Amount to False Testimony That Raises Serious Questions About His Candor

Mr. Mauro included in his report an analysis of a number of items that Summer Infant had identified as acceptable, non-infringing alternatives to the Accused Product. *See* Mauro Report at 17-20. The non-availability of such alternatives is a matter on which TOMY bears the burden of proof in order to establish a claim for lost profits. *See Mentor Graphics Corp. v. Eve-USA, Inc.*, 870 F.3d 1298, 1301 (Fed. Cir. 2017) (an "award of lost profits is not appropriate unless the patentee establishes that it would have sold the item but for the infringement" including showing an "'absence of acceptable noninfringing substitutes'") (quoting *Grain Processing Corp. v. American Maize-Products*, 185 F.3d 1341, 1351, 1349 (Fed. Cir. 1999)). TOMY's damages expert, Lindsey Fisher, had opined that TOMY was entitled to lost profit damages, relying on Mr. Mauro for the underlying conclusion that no acceptable, noninfringing alternatives were available.

Mr. Mauro stated in his report that he had "been advised that the relevant time for determining whether there was an acceptable, non-infringing substitute is during the time of infringement." Mauro Report at 17. This is the incorrect standard. The Federal Circuit has specifically held that "an available technology not on the market during the infringement can

constitute a noninfringing alternative" and "therefore limit or preclude [lost profit] damages." *Grain Processing*, 185 F.3d at 1351, 1356.

This misapprehension of the governing law led Mr. Mauro to reach an incorrect conclusion regarding one of the alternatives identified by Summer Infant, the "Redesigned Tub," with which it had replaced the Accused Product in its sales to Walmart. TOMY has conceded that the Redesigned Tub does not infringe the '209 patent. However, Mr. Mauro concluded that it was not an acceptable alternative that might preclude lost profit damages because, (1) it "was not available until October 2018, after the time of infringement" and therefore "was not available during the infringement period," and (2) the stacking characteristics of the Redesigned Tub made them unacceptable to Walmart. Mauro Report at 18.[9]

In response to TOMY's assertions regarding its entitlement to lost profit damages, Summer Infant disclosed Barry Sussman, a CPA with the firm of Blum Shapiro, as an expert on damages. Mr. Sussman expressed the opinion that at the time of the hypothetical negotiation that is necessary for the assessment of patent infringement damages, the technology was available for Summer Infant to develop an acceptable noninfringing product very quickly, potentially avoiding all infringement without any disruption of its bathtub sales. *See Grain Processing*, 185 F.3d at 1350-51 ("a fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer would have undertaken had he not infringed."). Sussman Report at 30.

---

[9] Mr. Mauro is incorrect about the date of availability of the Redesigned Tub, as it was actually delivered to Walmart months earlier. As for its acceptability to Walmart, Mr. Mauro does not contend with the fact that Walmart accepted delivery of hundreds of thousands of units without complaint.

At deposition, after Mr. Sussman's report had been issued,[10] Mr. Mauro did not confine himself to the facts, analysis, and opinions set forth in his report, but instead proclaimed an entirely new theory to argue that there could be no acceptable, noninfringing alternatives during the relevant time period.  Essentially, Mr. Mauro announced that Summer Infant could not have introduced a new noninfringing substitute for the Accused Product quickly because the technical requirements of the contract between Summer Infant and Walmart required extensive submissions, reviews, testing, and approvals, all governed by a contract running to dozens or hundreds of pages—which he had not reviewed and could not identify.

He previewed this new analysis and opinion in a very lengthy response to a question about why he had focused his review on Summer Infant's product development process:

> Well, the product development process always helps the designer or utility patent expert understand what was happening at the time that the product was being developed, and specifically in this case, for example, there's comments, you know, in the depositions, more specifically in the expert report of [Sussman], that a non-infringing acceptable alternative in the form of a product that was being modified to circumvent the '209 patent could have taken place in a very short period of time, he's saying months, or even, you know, shorter. And I have, you know, through my experience with product development, many of my clients have products at Wal-Mart. And as a result, **I'm intimately aware of the fiduciary responsibility and the technical requirements of companies who sell products at Wal-Mart**, and when I look at the testimony in terms of product development with respect to this, the infringing (inaudible), and more importantly, looking at modifications undertaken to assert the Accused Product.
>
> I see that in my personal experience it's very, very unlikely that Summer ever reported to Wal-Mart that the product no longer stacked within the 13 dimension requirement. Even though **everyone knows who produces products at Wal-Mart that that is a requirement, and if you have a design change that is promulgated by litigation or infringement, you must indicate that directly to Wal-Mart, and you need to have produced the**

---

[10] Mr. Mauro was not available during the expert discovery period to sit for his deposition, so Summer Infant was forced to take his deposition after disclosing its rebuttal expert. *See* Dkt. 75.

**prototypes, undergone the testing and receive approval**, and I don't see any sign in there. In fact, I see contrary signs in the product development process that **they did not submit the revised designs to Wal-Mart as required in the MSA**, and Wal-Mart was simply unaware.

So it shows me that, even though I'm not the damages expert, the time in which [Sussman] has said that it's possible for Summer to have developed an alternative, non-infringing alternative is completely unrealistic, in my experience in dealing with Wal-Mart. So -- and furthermore, **if they had made it clear to Wal-Mart that this was -- these changes were the source of litigation, in my experience that kicks the whole project up to another level of analysis at Wal-Mart**. So, saying that this could have been done, you know, made it non-infringing within a very short period of time. As an expert dealing with Wal-Mart and products sold at Wal-Mart, not happening.

Mauro Dep. at 48:25-51:1.  Techentin Ex. 2.  Mr. Mauro admitted that he had never requested, let alone reviewed, the actual contract between Walmart and Summer Infant.  Mauro Dep. at 65:10-13.  Nevertheless, he pontificated about minute details of this supposed "service agreement," that supposedly runs to "dozens, maybe hundreds of pages," including that "if you change the following attributes of a product for the following reasons, any of the following reasons, then Wal-Mart has to be notified, and you have to recertify the product, you have to send it back through their testing lab."  Mauro Dep. at 59:13-22.  He opined that under the agreement, the Summer Infant tub would be a "Category 2" product that "requires [Summer Infant's] direct acknowledgement and management of design changes" including a "checklist" and "registrations" and "testing methodologies."  Mauro Dep. at 55:15-56:14.

Given this minute recollection of this supposed contract, one might expect that Mr. Mauro had reviewed it in preparation for his deposition, but no.  Because he is "intimately aware of it," and because he "deal[s] with it with [his] clients who are certified and selling products to Wal-Mart every day," he "didn't need to look at it to know what the requirements are."  Mauro Dep. at 57:7-11.  Asked where it could be found, he suggested Googling "products

specifications" for Walmart.  Mauro Dep. at 57:17-58:1.  Asked if he'd seen the document from

TOMY—which is, after all, one of his clients that sells into Walmart—he responded:

> No. I didn't even ask for it, it's so basic to product development
> that an expert looking at a utility patent case that's changing a
> product based on infringement shouldn't even have to look at that
> document from Wal-Mart.  They know that requirement is a
> bedrock if those products are sold at Wal-Mart. You don't even
> have to look at it.

Mauro Dep. at 58:5-14.  Asked when he last reviewed it, he offered only that "I've referred to it,

you know, certainly in the last year."  Mauro Dep. at 58:15-18.  He did not recall the title of the

document.  Mauro Dep. at 59:4-7.

Summer Infant asked him, point blank:  "Did you bother to do any research to figure out

whether in fact you're correct about your recollection about that document?" and he responded

"No, I did not. I'm correct about that, I have intimate knowledge of those requirements."  Mauro

Dep. at 62:24-63:3.

The problem for Mr. Mauro and his newly minted opinions based on this document is

that they are, simply, not true.  TOMY produced the document that the witness had been

referring to after the deposition.  Techentin Decl. Ex. 10.  It is entitled "US Product Quality and

Compliance Manual."  It is not "dozens" or "hundreds" of pages long, it is seventeen pages.  It

does not require new prototypes to be submitted and tested where a design change results from

alleged infringement, but only a change in the UPC number (the unique identifier for tracking

purposes).  *Id.* at 7.  So if Mr. Mauro were correct, and this document applied to Summer

Infant's relationship to Walmart, all it would require would be that Summer Infant change the

product code.

Summer Infant was not obliged to do so, however, because ***this document did not exist at

any relevant time and was not a part of its contract with Walmart***.  It is dated July 31, 2019,

over a year after Summer Infant changed the design of the tub from the accused design to the current form, which TOMY admits does not infringe.  It had only existed for a little over a year when Mr. Mauro, who could only recall having seen it within the past year, testified so very wrongly as to its contents and applicability.  Moreover, Mr. Mauro would have known that this document (which he didn't bother to review because he was so intimately aware of it) was not a part of the contract between Summer Infant if he had thought to request that information from TOMY's counsel.  Summer Infant produced its supplier agreement with Walmart in discovery. Techentin Decl. Ex. 11  It is dated October 5, 2012 and contains literally none of the features that Mr. Mauro opined governed the relationship between Walmart and Summer Infant.  *Id.*  The Supplier Agreement contains an integration clause and therefore states the full scope of the relationship between the parties.  *Id.* at 17 ("This Amendment and the Supplier Agreement constitute the entire agreement between the parties with respect to its subject matter and no modification, change, or alteration shall be effective unless in writing and executed by both parties.").

In sum, the fact that these opinions and their bases were not disclosed in his report provides more than enough justification to preclude Mr. Mauro from testifying as to his opinions about noninfringing alternatives predicated on what he says the Walmart-Summer Infant contractual relationship was.  But those opinions certainly should not be offered where they are unfounded, false, and misleading.  It is a serious matter for an expert to testify in this manner. His claims to be "intimately familiar" with facts that are not facts, and his willingness to embellish details to give the illusion of being well informed, demonstrate a troubling lack of candor that can be explained only by a reckless disregard for his oath to tell "nothing but the truth" or, worse, a lack of adherence to that oath.  *See Bowling v. Hasbro, Inc.*, No. C.A. 05-229-

S, 2008 WL 717741, at *6 n.2 (D.R.I. Mar. 17, 2008) (an expert's "attempt to simply make up an answer to appear knowledgeable on the subject borders on deceitful" and "seriously undermines his credibility before this Court.").  Because expert testimony must be not only relevant but reliable, this demonstrated lack of candor, deliberate or not, justifies the Court's exercise of its "gatekeeper" function to exclude his testimony in full.[11]  *See Kumho Tire*, 526 U.S. at 147.

> **5.  Mr. Mauro Should be Precluded from Testifying as to Analysis and Conclusions Not Disclosed in His Expert Report, for Which There is No Factual Predicate, or That Are Inconsistent with the Court's Claim Construction Ruling**

Because his opinions have no more substance to them than the simple *ipse dixit* of Mr. Mauro himself, and because he has not even purported to analyze all of the claims elements that would be necessary to support his conclusion of infringement, and because of his demonstrated lack of candor in trying to support his arguments, Mr. Mauro should be precluded from testifying at all, in any capacity, in this case.  In the event he is not so precluded, however, the Court must severely curtail his testimony to mitigate his undisclosed and unsupported conclusions.

Many of Mr. Mauro's key conclusions and the facts and data that he contends to support those conclusions are not included, anywhere, in his expert report.  Those include:

- His opinion that the claims describe curved surfaces

- That "angle" and "incline" have meanings other than their ordinary, accepted meanings

- His reliance upon biomechanical considerations to interpret the claims language and/or to apply that language to the Accused Product, for example:

---

[11] Alternatively, Mr. Mauro should be precluded, at a minimum, from testifying as to whether or not the Redesigned Tub constitutes an acceptable noninfringing alternative as his analysis on that subject is premised on his opinions about what would be acceptable to Walmart, the very subject of his, to put it charitably, demonstrably incorrect testimony.  *See* Mauro Report at 18-19.

- o that "what's really important is that one of ordinary skill in the art when they read inclination, they understand curve, that's the way they read that specification." *E.g.*, Mauro Dep. at 162:17-20 (Techentin Decl. Ex. 2), which he admits is not "shown anywhere in the patent." *Id.* at 162:21-23.

- o that "from a  human factors engineering point of view, which is what drives these angles and drives the curved shape of these claims, you know, elements, the relative inclination looks right to me from the standpoint of the resting weight of an infant is roughly in the center of their lower abdomen, and the curvature in the angle, the degree in which it lays back appears correct to me, and if you look at the toddler, the toddler, because they have a much more heavily articulated spine at that point, and they have more muscular robustness, that back looks roughly equivalent to what it should be from human factors engineering point of view." *Id.* at 153:5-18.

- His conclusions regarding the time needed for Summer Infant to have developed a non-infringing alternative to the Accused Product, including:

  - o The "fiduciary responsibility and technical requirements of companies who sell products at Wal-Mart" (*Id.* at 49:14-16)

  - o That Wal-Mart requires notification of a design change that is done in response to an assertion of infringement

  - o Summer Infant's "responsibilities to Wal-Mart" (*Id.* at 53:10-12)

  - o Wal-Mart documentation requirements

41

o   The amount of time necessary to obtain approvals for a changed product at Wal-Mart

o   The obligations arising out of Summer Infant's "service agreement" with Wal-Mart

o   The contents of "U.S. documentation" that constitute a "huge system" that Summer Infant "has to adhere to in order to sell to Wal-Mart" (*Id.* at 55:14-56:3)

o   The Wal-Mart "recertification process" (*Id.* at 63:9-64:23)

These matters should be excluded for the simple reason they are undisclosed. But they are also fundamentally unreliable.

Mr. Mauro's analysis also assumes facts for which he offers no substantiation and that defy logic and common sense. His opinions based upon those assumptions should therefore be precluded as unreliable. Most particularly, he asserts and assumes that the "seating surface" for an infant using the Accused Product would consist exclusively of a roughly vertical wall and would not include the roughly horizontal portion. His report is devoid of any analysis as to why a "seating surface" should not include the portion that actually bears the weight associated with the buttocks of the infant, which would be the natural and expected meaning of the term. *See, e.g.*, *Seat*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/seat (last accessed 2/21/2021) ("the particular part of something on which one rests in sitting," citing "the *seat* of a chair" as an example).

Mr. Mauro's analysis does not dispute this common sense understanding of the term. Mr. Mauro actually explains his rationale for including a portion of the central protrusion as part of the toddler-side seating surface, stating: "The function of the seating surface is to give the child

42

somewhere to sit, ***which is met by the flat portion and upwardly curved portion***. Indeed the upwardly curved portion is shaped to support part of the weight (*sic*) toddler."  Mauro Report at 16 (emphasis added).  Remarkably, Mr. Mauro does not offer any such explanation for his radically different conclusion about the toddler side seating surface—that it does not contain any portion of the "flat portion" but is exclusively the "steep portion below [the] apex."  He offers no analysis of, let alone any evidence for, how this "steep portion" might "support part of the weight" of an infant, which is central to what it means to be a seating surface, whether one uses an ordinary dictionary definition or Mr. Mauro's own words.

Mr. Mauro's bald assertion that the toddler seating surface is exclusively the "steep portion" appears to be entirely tactical:  by selecting a "steep" portion of the tub, it enables him to summarily declare that the "'seating surfaces' are clearly of different inclinations."  Mauro Report at 10.  Had Mr. Mauro actually considered what "surface" is used for "seating" on the infant side of the Accused Product (*i.e.*, the part that "support[s] part of the weight" of the baby, he would have been forced to conclude that that surface, like the surface on the toddler side, is essentially horizontal (or, depending on where the actual boundaries of the surfaces are deemed to be) both horizontal and non-horizontal, as, for example, shown below:



| Option 1: Seating surfaces are the flat portions | Option 2: Seating surfaces include a portion of the central protrusion |
|---|---|

As one can see, in "Option 1" above the two surfaces are precisely the same inclination—flat.  In "Option 2" there are flat portions as well as a curved portion, but the curved portions roughly

mirror each other.[12]  Even leaving aside the fact that it is technically inaccurate to describe a

particular "inclination" of either of these curved surfaces, a good-faith assessment of what the

seating surfaces might be would preclude Mr. Mauro's assertion that they are "clearly of

different inclinations."

Finally, Mr. Mauro has offered two alternative theories of infringement, one of which is

clearly precluded by this Court's claim construction order.  Specifically, his "Analysis 2" for

Claim 1, which appears at page 48 of his expert report, recites that "[t]he edge of the right

seating surface furthest from its back rest is joined with the edge of the left seating surface

furthest from its back rest at an area of a high point of the bottom surface ***by a central bottom***

***portion***, as shown."  (emphasis added).  His illustration is reproduced below:



The Court's claim construction ruling precludes this analysis because it rejected TOMY's

argument that the claim language "joined at" should be interpreted to include "joined by" an

intermediary structure.  Mr. Mauro actually agreed that the Report and Recommendation issued

---

[12] Summer Infant does not contend that either of these examples is "correct," but merely offers
these specimens as alternative applications of Mr. Mauro's analytical framework.

by Magistrate Judge Sullivan would preclude this analysis, but he testified that he had included in his report because he believed that the Court had only adopted the chart of terms at page 21 of the Report and Recommendation and not the Magistrate's underlying analysis.  Mauro Dep. at 226:12-227:8 (Techentin Decl. Ex. 2).

Mr. Mauro is incorrect.  The Memorandum and Order issued by the Court stated: "The Magistrate's analysis is a painstaking, thorough and deliberative analysis of the exhibits, the arguments, and the relevant law.  I therefore ADOPT it in its entirety."  Dkt. 68 at 2.  That would include the conclusion that the claim language "joined at" "describes clearly the joinder of the two distal edges to each other at the apex; it does not encompass indirect joinder of the two seating surfaces to a third intervening structure."  Dkt. 54 at 17.  Mr. Mauro should not be permitted to testify as to an analysis whose foundation is contrary to the Court's claim construction order.

## CONCLUSION

In *McGovern ex rel. McGovern v. Brigham & Women's Hospital*, 584 F. Supp. 2d 418 (D. Mass. 2008), the Court held that a district judge performing her *Daubert* gatekeeper duties must ask three questions: (1) Is this junk science?; (2) Is this a junk scientist?; and (3) Is this a junk opinion?  584 F. Supp. 2d at 424.  This case does not even present a close call.  Mr. Mauro's unsound methodology, extemporaneous revision of his opinions, ignorance of the law, and reckless (or worse) assertions of facts that are not true demonstrate that he is a junk scientist applying junk science to come up with a junk opinion.

For the foregoing reasons, Summer Infant respectfully requests that this Court grant its motion to preclude TOMY from offering the testimony of its expert witness, Charles Mauro, at trial or otherwise.

Dated: February 22, 2021

Plaintiff and Counterclaim Defendant,
Summer Infant (USA), Inc.
By its attorneys,

/s/ Jeffrey K. Techentin
Jeffrey K. Techentin [No. 6651]
jtechentin@apslaw.com
William K. Wray [No. 9022]
wwray@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: 401-274-7200
Fax: 401-351-4607

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2021, I filed the within through the ECF system and that notice will be sent electronically to all counsel who are registered participants identified on the Mailing Information for C.A. No. 1:17-cv-549-MSM-PAS.

/s/ *Jeffrey K. Techentin*

1053922.v2