**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

SUMMER INFANT (USA), INC.,

    *Plaintiff,*

        -against-

TOMY INTERNATIONAL, INC.,

    *Defendant.*

C.A. No. 17-cv-549-MSM-PAS

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF SUMMER INFANT (USA), INC.'S MOTION IN LIMINE TO PRECLUDE DEFENDANT'S EXPERT WITNESS, LINDSEY FISHER, FROM TESTIFYING**

**INTRODUCTION**

In this patent infringement case, TOMY International, Inc. ("TOMY") asserted that Summer Infant (USA), Inc. ("Summer Infant") infringed its patent on a bathtub for infants and toddlers and seeks damages for such infringement. To support its damages claims, TOMY has offered the testimony of Lindsey Fisher, a CPA. Ms. Fisher intends to testify that, assuming Summer Infant is found to have infringed TOMY's patent, TOMY is entitled to lost profits damages or, in the alternative, a reasonable royalty. Ms. Fisher has offered opinions as to what she contends to be the proper measure of such damages. Because Ms. Fisher's opinions as to both lost profits and reasonable royalty are not reliable, her testimony should be excluded.

I.      BACKGROUND

On July 29, 2020, TOMY served its expert report for its damages expert, Lindsey Fisher. Ms. Fisher, a Director with the accounting firm Stout Risius Ross, LLC, was retained by TOMY's counsel to determine the damages to which TOMY is entitled assuming that Summer Infant is found to infringe TOMY's asserted patent. Techentin Decl. Ex. 1.[1] Ms. Fisher's report has never been supplemented or amended.

Ms. Fisher recites a number of sources of information for her analysis. These include discovery materials, court filings, and deposition transcripts. *Id.* at Exhibit 2. In her report, she also indicates that she obtained information from TOMY employees in the form of interviews, the full contents of which has not been disclosed to Summer Infant. *See*, *e.g.*, *id.* at 29 n. 120 (indicating that the source of her information for the cost of a component part was "Discussions with Rod Voss").

Ms. Fisher recites, correctly, that TOMY is not entitled to an award of lost profits damages unless it satisfies the so-called "*Panduit* factors," named for the seminal case of *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), which has been widely adopted and applied in patent cases. *E.g.*, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009). Under *Panduit* a patentee seeking lost profits damages must demonstrate:

- That there is a demand for the patented product;
- That there is an absence of acceptable, noninfringing alternatives to the accused product;

---

[1] The supporting exhibits to this motion are attached to the Declaration of Jeffrey K. Techentin In Support of Plaintiff Summer Infant (USA), Inc.'s Motion *In Limine* to Preclude Defendant's Expert Witness, Lindsey Fisher, From Testifying, submitted concurrently herewith ("Techentin Decl.").

2

- That the patentee has sufficient manufacturing and marketing capability to meet the demand; and

- The quantification of lost profits that would have been realized by the patentee but for the infringement.

Ms. Fisher provided her own analysis as to the first, third, and fourth *Panduit* factors. Fisher Report at 13-16, 23-31. As to the second *Panduit* factor, the absence of acceptable, noninfringing alternatives, Ms. Fisher provided extensive analysis, and also relied upon information from TOMY's other disclosed expert, Charles Mauro to the effect that some of the tubs that were already on the market would have been unacceptable to the customer (Walmart) because they lacked what Ms. Fisher referred to as the "efficient nesting feature" of the TOMY tub. Fisher Dep. at 124:11-20. Techentin Decl. Ex. 2. Ultimately, Ms. Fisher concluded that there were no acceptable noninfringing alternatives.

One of the alternative tub designs rejected by Ms. Fisher as being an "acceptable noninfringing alternative" to the accused product was the so-called "Redesigned Tub" that Summer Infant used to replace the accused product in its sales to Walmart. Ms. Fisher concludes that the Redesigned Tub was not acceptable to Walmart because "it does not have the nesting efficiency that the Accused Product has or that the TOMY covered product does." Fisher Report at 23. Techentin Decl. Ex. 1. In her report, Ms. Fisher does not explain why a product that was actually accepted by Walmart, as the Redesigned Tub had been for years, should be considered "unacceptable," nor could she explain away the fact that TOMY's 30(b)(6) witness had agreed that the Redesigned Tub was acceptable to Walmart, stating "If they continue to buy it, it continues to fill their need." J. Gomes Dep. at 253:10-15. Techentin Decl. Ex. 3. She acknowledged that "Wal-Mart would know what is was looking for." Fisher Dep. at 96:24-97:9. Techentin Decl. Ex. 2. Separately, she also concluded that the Redesigned Tub "was not implemented at the time of my lost profits damages period and was not made available to

3

Walmart until after October 9, 2018" and therefore should not be considered to be an "available" alternative.

On that last point, Ms. Fisher is simply incorrect. In fact, TOMY's counsel had already inspected the Redesigned Tub and confirmed in writing that it did not infringe the 209 patent on September 10, 2018, a date within Ms. Fisher's damages period. Techentin Decl. Ex. 4. Summer Infant had provided technical drawings of the revised tub as well as photographs of two of them stacked the month before, on August 14, 2018.   Techentin Decl. Ex. 5.

Based upon the information recited in her report and relying on the assumption that Mr. Mauro is correct that there were no acceptable, noninfringing alternatives to the Summer Infant accused tub, Ms. Fisher proceeded to calculate TOMY's lost profits by:  (1) determining TOMY's "but-for" revenue (that is, how much revenue TOMY would have realized if it had sold the units that Summer Infant had sold), (2) deducing the "but-for" incremental costs (such as the cost of goods) to determine the "but-for" incremental profit, and (3) accounting for returns and allowances.

Ms. Fisher did not rely on the books and records of TOMY to determine the deductions she would take from revenue in order to calculate lost profits, but instead relied upon a document generated specifically for the purposes of this litigation to show that the cost of goods sold is very low for TOMY's product (resulting in comparatively high profit margins. That document, produced after the close of discovery and indicating that it was last modified on August 5, 2020, reflects TOMY having seen steadily increasing profit margins on its tub until it ceased selling the product into Walmart. The document is inconsistent with the TOMY's 30(b)(6) deposition testimony, which indicated that in approximately 2016, Walmart had pressured TOMY to reduce its price, in response to which TOMY reduced the product costs and cut its price, reducing its

margins.  The designee testified that TOMY "tried to recoup some of the lost profit by adjusting some of the products, such as the padding in the sling, but we were never able to ge back to whole to whatever those percentages were." J. Gomes Dep. at 169:20-170:5.  Techentin Decl. Ex. 3.  Ms. Fisher reviewed this deposition testimony and yet opted to rely upon the made-for-litigation spreadsheet provided to her for her report.  She explained that decision this way:

> This document was verified and discussed with Mr. Voss and also equated very closely to the spreadsheet that was pulled, which you seem to find -- you haven't called that one produced for litigation. But I guess that to you is kind of the data where this is a little bit -- there's calculations associated with it, but both of those documents agree with each other. And those -- I know that you said -- I'll have to look at that testimony again, but if Ms. Gomes had a different understanding than what these documents show, I believe these documents would be the most accurate calculation of the cost of the product. Her sentence of they never made a certain amount of margin can be interpreted a lot of different ways. Therefore, I use the documents that show the actual sales and costs of the product for my lost profits calculation and also my reasonable royalty calculation as far as the other spreadsheet we were looking at.

Fisher Dep. at 209:22-210:16.  Techentin Decl. Ex. 2.  But Ms. Fisher has literally basis for believe that "these documents would be the most accurate calculation of the product," because the document does not contain actual corporate records but just a number of calculations based on judgments where the spreadsheet does not even reveal what the calculations might be. Several of the columns utilized percentages of figures that appear on other spreadsheets that neither Ms. Fisher nor Summer Infant have seen (*e.g.*, lines 39-41 of the "Sure Comfort Tub – Walmart" sheet).  Many are calculated supposedly using "ratio for Brand Profits + Sure Comfort Tub Sales 3-20-19 (Sales Team-Total Sales tab)," which, again, neither Ms. Fisher nor Summer Infant has seen.

All of Ms. Fisher's lost profit calculations rely on this made-for-litigation document.

5

Finally, Ms. Fisher's report provides an alternative analysis for TOMY's damages, in the form of a reasonable royalty. To determine the reasonable royalty, Ms. Fisher applies the standard approach for such an analysis, the *Georgia-Pacific* factors first outlined in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (D.C.N.Y. 1970), *aff'd,* 446 F.2d 295 (2nd Cir. 1971), *cert. denied,* 404 U.S. 870 (1971). There are 15 factors outlined in *Georgia-Pacific*, the last of which is:

> 15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Ms. Fisher accurately notes that this last factor "describes the integration of the other factors within the willing buyer / willing seller hypothetical negotiation framework." Fisher Report at 54. Techentin Decl. Ex. 1. Thus her analysis of this last factor is extensive, running from pages 31-54 of her report.

Ms. Fisher's analysis begins with a consideration of the date of the hypothetical negotiation. Ms. Fisher opines that it "would have taken place at or around the date of first infringement." Fisher Report at 32. Because the "first recorded sale of the Accused Products was on September 22, 2017," Ms. Fisher determined that the hypothetical negotiation "would have taken place sometime before, or around, September 22, 2017." *Id.* She later describes her hypothesized negotiation as taking place "in or around September 2017" based on the date of the first sale of accused product to Walmart. Ms. Fisher acknowledged that TOMY had been

informed by Walmart that Walmart would no longer purchase tubs from TOMY prior to September 22, 2017.  Fisher Dep. at 215:19-24.  Techentin Decl. Ex. 2.

At her deposition, Ms. Fisher clarified that "infringement" includes activities other than the sale of an infringing product, testifying that "first infringement begins during the sale, design, manufacturing of the accused product" and "offer to sale [*sic*] of the infringing product."  Fisher Dep. at 85:8-17.  Ms. Fisher agreed that the date of her hypothetical negotiation should be shortly prior to whichever was the earliest of those dates.  Fisher Dep. at 87:3-9.  Ms. Fisher did not know what any of the dates other than the first-sale date were, saying only "the hypothetical negotiation would have been some time in between that September [on-sale] date and when they were designing the tub.  When they actually designed the specific accused tub that infringed the patent-in-suit, that is for someone else to determine, because I'm not an engineer or technical expert."  Accordingly, Ms. Fisher has withdrawn her stated date of her hypothetical negotiation and has not formed an opinion as to the correct date.  However, in her report she notes that "Summer Infant began designing the [accused tub] in early 2017."  Summer Infant's 30(b)(6) designee testified that the produced design was finalized in "late March 2017, early April, maybe early April 2017."  Fusco Dep. at 54:13-20.  Techentin Decl. Ex. 6.

## II. ARGUMENT

### A. Applicable Legal Standards

The standards governing admissibility of expert testimony in this matter are set forth in full in the contemporaneously-filed motion *in limine* to preclude the testimony of TOMY's infringement expert, Charles Mauro, and are hereby incorporated by reference to avoid duplication.

> **B.    Ms. Fisher's Lost Profits Opinions Should be Precluded Because TOMY Cannot Show an Absence of Acceptable, Noninfringing Alternatives During the Damages Period.**

As Ms. Fisher acknowledges, the *Panduit* factors require that a patentee demonstrate an absence of acceptable, noninfringing alternatives during the proffered damages period in order to be entitled to damages in the form of lost profits. Fisher Report at 13 (Techentin Decl. Ex. 1); *see also Grain Processing*, 185 F.3d at 1353 ("The critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, *i.e.*, the 'accounting period.'"). Ms. Fisher's damages period runs from September 22, 2017 through October 9, 2018. Fisher Report at 62.

TOMY cannot credibly suggest that there were no acceptable, noninfringing alternatives available to Walmart during Ms. Fisher's damages period. Summer Infant's Redesigned Tub was available during the damages period, did not infringe, and was acceptable to Walmart. As to the first consideration, although Ms. Fisher was under the impression that the Redesigned Tub was not designed until the end of her damages period (Fisher Report at 23), that is incorrect. TOMY itself possessed and inspected samples of the Redesigned Tub a month earlier, and had seen photographs and CAD drawings a month before that. Thus, it is beyond dispute that the Redesigned Tub was available during Ms. Fisher's damages period.

As to the question of the Redesigned Tub being noninfringing, that is also beyond dispute, as counsel for TOMY confirmed in writing that it does not infringe the '209 patent.

That leaves the question of whether the Redesigned Tub was "acceptable" to Walmart. The fact that the Redesigned Tub was acceptable is beyond reasonable dispute because Walmart has, in fact, accepted the tub for years. It has accepted literally hundreds of thousands of them, without complaint or even a comment. TOMY's 30(b)(6) designee recognized the significance of Walmart's continued purchase of the tub, noting that "If they continue to buy it, it continues to

8

fill their need." J. Gomes Dep. at 253:10-15. Techentin Decl. Ex. 3. Walmart's acceptance of the product is unsurprising because the change from the accused tub to the Redesigned Tub consisted of the addition of a small quantity of ribs under the rim of the tub that cannot even be seen by the casual observer and that have no impact on the function of the tubs.

Ms. Fisher's only basis for suggesting that Walmart's actual acceptance of the Redesigned Product does not indicate that the product was "acceptable" to Walmart is an email in which, she says, "the Walmart buyer" "informed Summer Infant in May of 2017 that its tub would need to be no more than 13 inches when stacked," and the Redesigned Tub exceeds that threshold. Fisher Report at 23, 49. Techentin Decl. Ex. 1. There are three practical problems with Ms. Fisher's contention in that regard: First, Ms. Fisher is an accountant. She is not an expert in the details of Walmart product reviews, product specifications, technical requirements, or anything else about whether Walmart would have found the product acceptable. If TOMY wishes to contend that Walmart would have rejected the product that it didn't reject, it should present competent evidence to that effect. Submitting it through a damages expert, as eminently qualified as she might be on accounting matters, is inappropriate.

Second, the email to which she is referring was written by a Summer Infant employee, is at least double hearsay, and does not even state that the Walmart buyer placed any specific limitation on the height of Summer Infant's tub – again, *it does not state that Walmart required a specific stacking height*. As Ms. Fisher admitted at her deposition, it is not clear from the email whether the "13 inch" limitation was suggested by Walmart or Summer Infant:

> Q. And then the next sentence reads, "At three stacked we're over 14 inches currently." Do you see that?
>
> A. Yes.
>
> Q. And is that something that the Wal-Mart buyer said to Eric Hauser?

9

>       A. I wouldn't know one way or the other. This is an e-mail written on what -- based off of the conversation he had with Eric Hauser, based off a conversation they had with the Wal-Mart buyer, so I couldn't tell you.
>
>       Q. And then the next sentence says, quote, "We cannot exceed 13 inches when stacking three tubs." Close quote. Correct?
>
>       A. That's what I read as well.
>
>       Q. Do you have any reason to believe that statement was made by the Wal-Mart buyer to Eric Hauser?
>
>       A. I would assume this is all related to that conversation. Could I say specifically if those words were said? I can't, I was not there.

Fisher Dep. at 151:25-152:19. Techentin Decl. Ex. 2. Ms. Fisher admits that it is only an assumption on her part that this email evidences an objective requirement by Walmart with respect to the stacking characteristics of an "acceptable tub." *Id.* at 152:20-153:3.

The third practical impediment to crediting Ms. Fisher's analysis that Walmart would have refused to purchase the Redesigned Tub is that Walmart actually purchased, again and again, for years, the Redesigned Tub. Even if Ms. Fisher's assumption about the email, discussed above, was correct, so on the date of that email (May 5, 2017), the Walmart buyer had expressed a desire, or even a requirement, that the three tubs stack at a height of no more than 13 inches, Walmart's course of conduct revealed that by the time Summer Infant actually introduced the Redesigned Tub, Walmart did not have such a requirement. Ms. Fisher has zero evidence – not an iota, or even an assumption – that supports Walmart imposing any such requirement at any point after Summer Infant changed the design of its tub.

Accordingly, it is beyond dispute that during Ms. Fisher's damages period, the Redesigned Tub was available – because it had actually been manufactured – and noninfringing – because TOMY inspected it and confirmed that fact – and acceptable to Walmart.

10

Accordingly, TOMY cannot satisfy the elements of the *Panduit* test and is not entitled to an award of lost profits.

> **C.    In the Alternative, Ms. Fisher's Lost Profits Opinions Should be Precluded Because They Are Founded Upon Unreliable Documents Created for Litigation.**

Ms. Fisher's lost profit calculations are relatively straightforward. She calculates what she believes to be the number of infringing units sold by Summer Infant[2] and then multiplies that quantity by her estimate of what TOMY would have sold its tub to Walmart for, establishing the total "but-for" revenue that TOMY would have realized. In order to reduce that to a profit figure, however, she must, and purports to, reduce the revenue figure by the costs that would be associated with making such sales.

It is essential for a damages expert to deduct these costs from revenue in order to reach an opinion of lost profit damages. It is axiomatic that if the expert relies upon unfounded assumptions regarding the amount of those costs, her ultimate opinion as to the amount of profit actually lost will be unreliable.

The Supreme Court has instructed that "[a] trial court must decide whether a qualified expert's testimony rests on a reliable foundation, or is simply based on 'subjective believe or unsupported speculation.'" *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993). The *Daubert* inquiry rests not on the substance of the expert's conclusions, but whether those conclusions were generated utilizing a reliable methodology. *See*, *e.g.*, *United States v. Shea*, 211 F.3d 658, 668 (1st Cir. 2000) (noting that where an expert employs a reliable methodology, flaws in the application of that methodology go "to weight and credibility and not admissibility").

---

[2] Summer Infant disagrees with her calculation of accused units sold because her figures exceed the total number of accused units ever produced, but that dispute is beyond the scope of this motion.

11

"Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 Civ. 8136, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F.Supp.2d 409, 424–25 (S.D.N.Y.2009). Here, Ms. Fisher has been presented with two sets of information that might inform her analysis of the profitability of TOMY's tub:

- The sworn testimony of TOMY's Rule 30(b)(6) witness, that TOMY's profit margins post-2016 were reduced as a result of price concessions that TOMY made to Walmart, despite cost-saving efforts such as reducing the cost of the product.
- The unsworn and unexplained spreadsheet that TOMY created and provided to Ms. Fisher after the close of discovery that shows TOMY's profit margins to be steadily increasing, including after 2016, a spreadsheet that contains calculated figures and no information about the nature of how those calculations were made.

Ms. Fisher chose the latter and did nothing to reconcile the data her client was providing to her with the client's earlier, sworn testimony to the contrary because it maximized her damages calculations. [REDACTED] Voss Dep. (6/18/19) at 240:14-241:13 and Exhibit 28 to Voss Dep. Techentin Decl. Ex. 7. [REDACTED]

---

3 [REDACTED]

12

**REDACTED**

Ms. Fisher's decision to uncritically accept a representation of the product costs that resulted in an opinion that TOMY would have realized a 34% margin by selling its tubs to Walmart when TOMY's testimony was that its margins had never gotten back to the 27% seen in 2016 is not the product of a "reliable methodology" and renders her conclusions regarding profitability of the tub unreliable. Her testimony should therefore be precluded with respect to her opinions as to the amount of TOMY's lost profit damages even if TOMY is found to be theoretically entitled to such relief.

### D. In the Alternative, Ms. Fisher's Lost Profits Opinions Should be Precluded Because They Rest Upon An Unstated and Unfounded Assumption that Walmart Would Purchase the TOMY Tub.

Ms. Fisher acknowledges that prior to any sales to Walmart of the accused tub, Walmart had terminated TOMY as a supplier of its opening-price-point multistage bath tub. Fisher Dep. at 215:15-22. Techentin Decl. Ex. 2. This decision did not occur in a vacuum. Walmart had been pressuring TOMY to reduce its price for its tub since 2015. Fisher Dep. at 196:20-24 (Techentin Decl. Ex. 2); Voss Dep. (6/18/19) at 265:7-15 and Exhibit 29 (Techentin Decl. Ex. 7). Walmart had told TOMY not only that its price was too high, but that there were other products on the market, at more competitive prices, that Walmart had examined and found to be comparable to the TOMY tub. In order to arrive at an opinion of lost profits, Ms. Fisher had to conclude that, but for the infringement, Walmart would have purchased the tubs from TOMY rather than going to one of the other, less expensive tubs available on the market that Walmart had indicated were "comparable" to the TOMY tub. *See* Voss Dep. (6/18/19) at Exhibit 29.

13

Techentin Decl. Ex. 7. But Ms. Fisher has no actual evidence that Walmart would have been willing to purchase a terminated product and therefore cannot show that but for the infringement, TOMY would have made these sales.

The fact that Walmart was unhappy with the price demanded by TOMY, as well as the fact that Walmart actually terminated them as a supplier of the tubs, strongly suggests that, at a minimum, there would have been barriers to TOMY re-acquiring that business segment. But Ms. Fisher provided no analysis as to why Walmart might reverse course and renew its business with TOMY after finally terminating them following an unsuccessful multi-year effort to get TOMY's price to an acceptable level. Instead, Ms. Fisher merely assumed that the "historical buying preference of Wal-Mart and their continued use of TOMY for these tubs throughout – prior to the infringement period, and [her] understanding is they still do a lot of business with Wal-Mart today" would mean that Walmart would buy tubs from TOMY. That is not a reasonable inference in light of the affirmative decision by Walmart not to do so. Ms. Fisher's testimony in this regard is entirely speculative and should be excluded.

### E. Ms. Fisher's Reasonable Royalty Opinions Should be Precluded Because She Has Failed to Identify the Date of the Hypothetical Negotiation.

Ms. Fisher acknowledges that the very first step in determining a "reasonable royalty" based on a hypothetical negotiation between the parties as called for by *Georgia-Pacific* factor 15 is to identify the date of that negotiation. Fisher Report at 32. Ms. Fisher states in her report that the negotiation "would have taken place at or around the date of first infringement," which is the incorrect standard. The hypothetical negotiation date is "the date that infringement began." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012). Ms. Fisher's suggestion that it would be "around" that date is incorrect as it must be prior to infringement because the parties are negating (hypothetically) to ***avoid infringement***.

Ms. Fisher corrected this error at her deposition, noting that the correct date would be prior to the first infringement, and further noting that the approximate time frame identified in her report ("before, or around, September 22, 2017") was incorrect because there were alleged acts of infringement that occurred earlier than that. *Compare* Fisher Report at 32 (Techentin Decl. Ex. 1) *with* Fisher Dep. at Dep. at 85:8-17 and 87:3-9 (Techentin Decl. Ex. 2). Because she did not know the dates for the events that she identifies as being the first acts of infringement (*e.g.*, product design and offers to sell), she does not know the date of her hypothetical negotiation.

The date of the hypothetical negotiation is a critical factor in an expert's evaluation of the potential royalty that a patentee and alleged infringer might agree upon. Thus courts have precluded expert witnesses who have identified the incorrect hypothetical negotiation date. *See*, *e.g.*, *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, No. CV 17-189-LPS, 2020 WL 7028529, at *10 (D. Del. Nov. 30, 2020) (precluding the damages expert's opinion because it relied on the wrong date of first infringement to arrive at the hypothetical negotiation date); *Cassidian Commc'ns, Inc. v. microDATA GIS, Inc.*, No. 2:12-CV-00162-JRG, 2013 WL 12148459, at *1 (E.D. Tex. Dec. 10, 2013) ("The Court previously granted Plaintiff's *Daubert* Motion to exclude the testimony of Defendants' damage expert Mark Gallagher, on the ground that Mr. Gallagher's entire expert opinion was based on an incorrect hypothetical negotiation date, almost two years after the date infringement began."). Notably, Summer Infant is not aware of any cases where a court has been called upon to assess the reliability of a reasonable royalty analysis where the expert has entirely abrogated her responsibility to identify the appropriate date for the hypothetical negotiation date, presumably because the identification of

that date is so essential to the expert's analysis that to fail to identify the date at all would be deficient *per se*.

Summer Infant notes that under the facts of this case, the date is of critical importance to the royalty that might be agreed upon at a hypothetical negotiation. Summer Infant developed and sold this product within the span of only a few months, and redesigned it to avoid infringement in even less time. A hypothetical negotiation that occurred early in 2017, six months before Summer Infant needed to deliver product to Walmart, would have presented Summer Infant with the option of designing around the patent and avoiding infringement at all, whereas a negotiation on the very eve of Summer's delivery of product to Walmart on September 22, 2017, would have put Summer Infant in a very different negotiating stance. And, of course, because Ms. Fisher's report, including her conclusion as to a reasonable royalty, are based on a September 2017 assumption (since abandoned), that conclusion has the disadvantaged Summer Infant position "baked in" to her analysis.

Summer Infant recognizes that if Ms. Fisher were to identify a date for her hypothetical negotiation, which to date she has not done, and if that date had some reasonable degree of factual support, that would present a jury question, and not a *Daubert*-type issue. *See TVIIM, LLC v. McAfee, Inc.*, No. 13-cv-04545-HSG, 2015 WL 4148354, at *3 (N.D. Ca. July 9, 2015) (holding defense expert's selection of hypothetical negotiation date not a *Daubert* issue, but instead a jury question, where there were "sufficient facts" to support the expert's date selection). Here, however, her opinions are based on a date (around September 22, 2017), that she acknowledges is wrong. To the extent she is able to identify some other date, the positions of the parties would be different, and she would need to arrive at a new conclusion of reasonable royalty to reflect that change as well as to support her selection of that date with "sufficient

facts." As it stands, she has no position as to the correct date, and therefore it cannot be said that her position is supported by any facts, let alone sufficient facts. Her opinion on reasonable royalty is thus entirely unreliable, and should be precluded.

## CONCLUSION

For the foregoing reasons, the opinions expressed by Ms. Fisher as to both lost profits damages and reasonable royalty damages are unreliable and incapable of being of legitimate assistance to the trier-of-fact. The Court should exercise its gatekeeping function to exclude these conclusions from evidence at trial and otherwise.

Dated: February 22, 2021

Plaintiff and Counterclaim Defendant,
Summer Infant (USA), Inc.
By its attorneys,

/s/ Jeffrey K. Techentin
Jeffrey K. Techentin [No. 6651]
jtechentin@apslaw.com
William K. Wray [No. 9022]
wwray@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: 401-274-7200
Fax: 401-351-4607

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2021, I filed the within through the ECF system and that notice will be sent electronically to all counsel who are registered participants identified on the Mailing Information for C.A. No. 1:17-cv-549-MSM-PAS.

/s/ *Jeffrey K. Techentin*

17